# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **Equal Employment Opportunity Commission** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 C 2001 |
| v. | ) | |
| | ) | |
| **RJB Properties, Inc., and Blackstone Consulting, Inc.,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In this action, the EEOC brings claims: 1) on behalf of seventeen present and former employees of defendant RJB Properties who worked as janitors or janitorial supervisors at the site of one of defendants' clients, Illinois Institute of Technology ("IIT"); and 2) on behalf of five present and former employees who worked as janitors at Thornwood High School, which is part of School District 205, another of defendants' clients. In its complaint, the EEOC asserts that defendants discriminated against Hispanic janitors on the basis of their national origin, and that they retaliated against two African-American supervisors for refusing to do the same. The EEOC also brings a claim of sexual harassment on behalf of one of these supervisors.

Now before me are two motions for summary judgment. In the first, which is supported by two separate factual statements and two memoranda of law (relating to the "IIT claimants" and the

"Thornwood claimants," respectively), defendants assert that none of the EEOC's claims of national origin discrimination should be allowed to proceed to trial. In the second, defendant Blackstone Consulting, Inc., ("BCI"), asserts that it should be dismissed from the case because it did not employ any of the claimants, and that there is no basis for liability under the theories that it was a single employer or a joint employer with defendant RJB. These motions are resolved as follows.

## I. Background

### A. The IIT Claimants

I address in later sections the EEOC's detailed allegations and evidence relevant to each claimant's particular claims. For a proper understanding of those, however, some factual context is necessary.

At the time relevant to the events at issue, RJB provided janitorial services to IIT pursuant to contract. The contract required that RJB implement and adhere to an equal opportunity employment policy. Four different classifications of RJB employees provided services under the contract: 1) "call-in" employees (also referred to as "replacement" or "temporary" employees); 2) "introductory" employees; 3) permanent full-time employees; and permanent part-time employees. Call-in janitors were not assigned to a regular shift or schedule, were not guaranteed hours, were not eligible for employer sponsored benefits, and were not members of

Service Employees International Union (SEIU) Local 1, which represented RJB's permanent janitorial employees, and with which both RJB and IIT had a collective bargaining agreement (the "CBA").

The CBA governed various aspects of employee work life at RJB, including seniority rights, procedures for filling vacant positions, assignment of overtime, employee grievances, and wages and hours. Although not members of the union, call-in janitors were subject to the CBA in some respects, such as their eligibility for vacant permanent positions. RJB employees were also subject to an employee handbook, which sets forth additional policies relating to issues including employee work schedules, rest periods, overtime, attire, and discipline. With respect to discipline, the employee handbook establishes a progressive discipline policy: the first level is a verbal warning (which is memorialized in writing, and is sometimes referred to as a "written verbal warning"), followed by two successive written warnings, a three-day suspension without pay, and termination.

RJB janitors working at IIT reported to their supervisors, who themselves reported to the project manager responsible for the site. Project managers had authority to hire and to discipline janitors, but they needed approval from human resources before they could fire janitors. Project managers were responsible for posting vacant janitorial positions and for selecting janitors for the positions.

Until spring of 2006, the project manager at IIT was Patricia Figueroa, who is Hispanic. Figueroa was replaced by claimant Tony Wesley, who is African-American, and who held the position until April of 2007. Mark Bonk, who is white, replaced Wesley in May of 2007 and was the project manager until RJB lost the IIT contract.[1] Supervisors at IIT during the relevant period included claimant Todd Jackson, as well as Jeff Bass, Mike Holliday, Thomas Jones, Santre Holmes, and Jeff Thompson on the night shift, and Annie Caldwell and Cathola Smith on the day shift. All RJB project managers reported to general manager Angela Shumpert, who was employed by BCI. Shumpert reported to Jim Blackstone at BCI, but for day-to-day matters concerning RJB, she reported to RJB's president, Ron Blackstone.

Shumpert is at the heart of the EEOC's allegations of discrimination. The EEOC identifies evidence of Shumpert's hostility towards Hispanics and of her disparate, sometimes abusive treatment RJB's Hispanic employees. Several EEOC claimants and witnesses testified that Shumpert used such terms as "wetbacks," "spics," and "bean-eaters," and also said that Mexicans smell, are lazy, and complain too much. Claimant Tony Wesley and former RJB project manager Ella Patterson both testified that Shumpert used

---

[1]RJB lost the "academic" portion of the IIT contract to a competitor, ABM, in 2008, and lost the remainder of the contract in 2010. It is not clear from the cited portions of the record whether Bonk was the project manager until 2008 or 2010.

these terms frequently during management meetings attended by project managers, and Patterson recalls that Shumpert once called Patricia Figueroa, whom Shumpert "made [] cry all the time at these meetings," a "stupid Mexican bitch."  Patterson Dep., EEOC Supp. Exh. at 66:8-67:8, 83:9-16 (DN 182-1).  Patterson further testified that, in addition to her use of racial epithets, Shumpert discriminated against Hispanic workers at IIT, "[b]ecause she wasn't giving them the stuff they needed to work with but then she would reprimand them for not doing the work.  And if a black person came to her and needed something, nine times out of ten they got the stuff they needed." *Id*. at 86:2-7.

Patterson also testified that Shumpert would tell supervisors or project managers to discipline or terminate Hispanic employees "if they were a problem," i.e., if they "complained a lot to the union."  According to Patterson, "if they [i.e., Hispanic janitors] thought that Angela was discriminating against them," Shumpert would say "she wanted them gone" and to "get rid of them." *Id*. at 93:13-94:7.  Patterson identified claimant Maria Rodriguez as an Hispanic employee whom Shumpert fired for complaining to the union and testified that although "a lot" of African-American employees likewise complained to the union, she was not aware of any who had been terminated for that reason. *Id.* at 159:20-160:20.

Similarly, Wesley testified that Shumpert said of Hispanic employees, "anybody who doesn't want to comply with our practices,

get rid of their fucking spic asses," and that she specifically mentioned claimants Gladys Navarro (whom she referred to as a "fucking spic bitch"), Elqui Navarro, Eduardo Chavez, and Alberto Garcia. Wesley Dep., Def.'s L.R. 56.1 Stmt., Exh. 76 at 257:2-7, 45:16 (DN 137-4). Patterson, Wesley, and Jackson all testified that Shumpert told them to do whatever it took to get rid of Hispanic employees who were causing trouble, including by planting drugs on them, (Patterson Dep. at 90:12-92:14, 324:18-21) (DN 182-1); Wesley Dep., at 87:15-20, 270:19-271:9 (DN 137-4); Jackson Aff., Pl.'s L.R. 56.1 Stmt., Exh. 6 at ¶ 2 (DN 153-1), or saying they had caught them sleeping, Jackson, Aff. at ¶ 2 (DN 153-1).

Few Hispanic claimants, however, testified that they actually heard Shumpert, or anyone else at RJB, use ethnically hostile language in their presence. Several claimants testified that they were never subjected to, or heard, any ethnic slurs, and other claimants stated that they could recall hearing derogatory terms such as "wetback" used on only one or two occasions over months or years of employment.

## B. The Thornwood Claimants

RJB provides janitorial services for Thornton Township High School District 205, which comprises three high schools: Thornwood High School (the work site of the five claimants on whose behalf the EEOC brings claims in this case), Thornridge High School, and Thornton High School. During the school year, RJB employs two

shifts of janitors at Thornwood. The parties agree that the day shift generally runs from 6:00 a.m. to 4:30 p.m., although it is likewise agreed that the "normal" shifts of two African-American "day matrons" on the day shift were 7:00 a.m. to 3:30 p.m. (Gloria Kelly) and from 8:00 a.m. to 4:30 p.m. (Rosemary Offett). The night shift runs from 3:00 p.m. to 11:30 p.m. At times relevant to this case, six RJB janitors worked on the day shift, of whom five were African-American and one was Hispanic, and fifteen RJB janitors worked on the night shift, of whom thirteen were Hispanic (including all five claimants) and two were African-American. The project manager at Thornwood was Levetrice Gant, and the assistant project manager, who supervises the day shift, was Shateau Shorter. The night shift supervisor was Carl Rogers. All three supervisory employees are African-American.

RJB's contract with District 205 specifies that "[a]ll heavy cleaning services shall be performed between the hours of 3:30 p.m. and 12:00 midnight, except as needed in special or emergency situations." Def.'s L.R. 56.1 Stmt., Exh. 39 at 3, ¶ H (DN 134-5). The contract also provides that "[a]ll employees of [RJB] must demonstrate the ability to communicate with staff and students in verbal and written English sufficient to read and understand the equipment and supply instructions, labels and safety requirements." *Id.*

With one exception, the EEOC does not claim that any of the claimants heard RJB supervisors at Thornwood using hostile or derogatory language targeting the claimants' national origin, or otherwise expressing a bias against Hispanics. As discussed in further detail in a subsequent section, the EEOC bases its claims on putative evidence that RJB limited the claimants' overtime opportunities, imposed extra work on them, failed to provide them with cleaning supplies as "readily" as it did African-American janitors, and otherwise harassed them based on their national origin. The EEOC also asserts that one of the Thornwood claimants, Minerva Flores, was terminated because she is Hispanic.

## II.  Legal Standard

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when "the pleadings, discovery and disclosure materials on file, as well as any affidavits, demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Hasan v. Foley & Lardner LLP,* 552 F.3d 520, 527 (7th Cir. 2008). Ordinarily, the initial burden lies with the movant to demonstrate, based on specific evidence identified in the record, the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In this case, however, after the EEOC objected to defendants' submission of hundreds and hundreds of facts in support of their motions, I allowed the parties, upon agreement, to proceed on the assumption that defendants' facts, if

unopposed, would indeed support a judgment for defendants and directed the EEOC to articulate the facts, and to identify the evidence, it believed demonstrated a prima facie case with respect to each claimant entitling it to a trial. I did not, however, require the EEOC to respond individually to each of defendants' asserted facts. Defendants then responded to the EEOC's submissions. In light of the parties' submissions, and after careful review of the record, I then directed the EEOC to respond only to those facts I deemed potentially material to the resolution of defendants' motions.

Although this atypical approach departs from the manner in which summary judgment ordinarily proceeds, the parties' ultimate burdens remain the same: On any issue as to which the EEOC carries the burden of proof, it must come forward with "specific facts showing that there is a genuine issue for trial," doing "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Because the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff," *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993), to survive summary judgment the EEOC must demonstrate that "the record taken as a whole" could permit a rational fact finder

to conclude that the claimants were victims of unlawful discrimination. *Matsushita*, 475 U.S. at 587.

In determining whether the EEOC is entitled to trial, I must "view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 254 (1986). "Because intent and credibility are typically crucial issues in employment discrimination cases, summary judgment must be approached with caution, and heightened scrutiny of the record is appropriate." *E.E.O.C. v. International Profit Associates, Inc*., 654 F. Supp. 2d 767, 783 (N.D. Ill. 2009) (citing *Talanda v. KFC Nat. Management Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998)). Nevertheless, if the factual context as reflected by the record as a whole renders the EEOC's claim "implausible," it "must come forward with more persuasive evidence to support [its] claim[s] than would otherwise be necessary." *Matsushita,* 475 U.S. at 587. "Mere subjective beliefs by the plaintiff-without the backing of hard evidence-cannot prove that an action was inspired by improper motivations." *Pilditch v. Board of Educ. of City of Chicago*, 3 F.3d 1113, 1119 (7th Cir. 1993).

Title VII prohibits discrimination against an employee on the basis of national origin, among other grounds, with respect to the material terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a). Claims pursuant to this section of the statute may arise out of a tangible, adverse employment action such as a

termination, a demotion, or a failure to promote--this is the type of claim most often referred to as "discrimination"--or out of the existence of a hostile or abusive working environment--this is frequently called a "harassment" or a "hostile environment" claim--which need not allege a tangible adverse action. Regardless of how the claim is labeled, however, the ultimate question is whether the employer's conduct materially affected a "term, condition, or privilege" of employment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (explaining that discriminatory harassment, whether based on sex or another protected characteristic, is actionable under Title VII when it is sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." (citation omitted) (original alteration)); *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006) (characterizing phrase "adverse employment action" as "a judicial gloss [that] must not be confused with the statute itself or allowed to displace the Supreme Court's approach," which inquires whether there has been a "material difference in the terms or conditions of employment").

Title VII also makes it unlawful "for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). This type of discrimination is commonly called "retaliation," *Tomanovich v. City of Indianapolis*,

457 F.3d 656, 662 (7th Cir. 2006), and it is proven when the employee establishes a causal nexus between an employee's protected, "opposition conduct" and a material change in the terms or conditions of employment. *McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir. 1996). The protective ambit of this provision extends to employees who passively resist their employer's unlawful discrimination. *Id*.

In this case, the EEOC seeks monetary damages on behalf of each of the claimants, asserting, at different points, each species of claim identified above.[2] The EEOC pursues some claims on a discrimination theory of disparate treatment, arguing that RJB discriminated against some Hispanic claimants on account of their national origin by terminating them (in the case of Chavez, Sergio Medina, Mendoza, Vazquez, Rosales, and Rodriguez); suspending them (in the case of Gladys Navarro); or failing to promote them (in the case of Del Toro, Obregon, Teodoro Medina, Alvarez, and Rosales), while similarly situated African-American employees were not subjected to the same treatment. The EEOC also contends that some Hispanic claimants (Vazquez, Gladys Navarro, Elqui Navarro, Teodoro Medina, Obregon, Del Toro, Lopez, Garcia, and Avila), were harassed (i.e., subjected to a hostile environment) on account of their

---

[2]Technically, all of these claims are for "discrimination," but for ease of reference, I may refer to them, consistently with common practice, as "discrimination" (or, in appropriate instances, "disparate treatment"), "harassment" (or "hostile environment"), and "retaliation" claims, respectively.

national origin. Finally, the EEOC asserts that four claimants, both Hispanic and African-American (Wesley, Jackson, Vazquez, and Navarro), were subjected to retaliation either for failing to discriminate against Hispanic employees or for complaining about discrimination.[3]

The EEOC may rely on either the direct or the indirect method of proof to establish a prima facie case of discrimination or retaliation. *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring) ("[w]e now have, for both discrimination and retaliation cases, two broad approaches-the "direct" and the "indirect."). Under the direct method, the EEOC may withstand summary judgment of its discrimination claims--which it must do individually as to each particular claimant[4]-if it can present

---

[3]In addition, one claimant--Todd Jackson--claims that he was sexually harassed. Defendants have stated that their summary judgment motion does not extend to this claim, so I do not address it in this opinion. Tony Wesley also asserts a claim for constructive discharge, which defendants' motion does not specifically address. I understand the constructive discharge claim to be part and parcel of Wesley's retaliation claim, however, because the EEOC's theory is that defendants constructively discharged Wesley in retaliation for taking a protected action. Accordingly, I analyze these claims together.

[4]Although the EEOC alleges a "pattern or practice" of discrimination by defendants in its complaint, I agree with defendants that each individual's claim for monetary damages depends on whether the EEOC can show that that claimant specifically was subjected to discriminatory treatment. *See E.E.O.C. v. International Profit Associates, Inc.*, No. 01 C 4427, 2007 WL 3120069, at *2 (N.D. Ill. Oct. 23, 2007)(Gottschall, J.) (Evidence of a "pattern or practice" of discrimination supports the EEOC's claim for prospective relief under *Int'l Brotherhood of Teamsters v. U.S.*, 431 U.S. 324 (1977), but "where individual

sufficient evidence to "permit a jury to infer that discrimination motivated an adverse employment action." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). This means that the EEOC's evidence must point directly to a discriminatory intent on the part of the decisionmaker responsible for each adverse action. *Harris v. Warrick County Sheriff's Dept.*, 666 F.3d 444, 448 (7th Cir. 2012) (to prove discrimination, evidence must establish "that the *decisionmaker* has acted for a prohibited reason.") (original emphasis) (internal quotation marks and citation omitted). Where the record suggests that more than one individual was responsible for a particular decision, evidence of discriminatory animus on the part of "someone who provided input into the adverse employment decision" is relevant. *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 528 (7th Cir. 2008).

Evidence relied upon under the direct method of proof may be either direct or circumstantial. Direct evidence "is something close to an explicit admission that a particular decision was motivated by discrimination," which "uniquely reveals" the employer's intent to discriminate. *Diaz,* 653 F.3d at 587. Circumstantial evidence, which "suggests discrimination albeit through a longer chain of inferences," *id.* (quoting *Hasan*, 552 F.3d at 527), generally falls into one of three categories:

---

relief is also sought...the EEOC must still prove that the individual claimants were victims of the discriminatory policy.").

> (1) ambiguous statements or behavior towards other
> employees in the protected group; (2) evidence,
> statistical or otherwise, that similarly situated
> employees outside of the protected group systematically
> receive better treatment; and (3) evidence that the
> employer offered a pretextual reason for an adverse
> employment action.

*Id*. at 587. A plaintiff need not present evidence in all three of these categories, *id.*, but the circumstantial evidence must together compose a "convincing mosaic of discrimination." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).

As long as the plaintiff's evidence "creates a triable issue on whether discrimination motivated the employment action," it is entitled to proceed to trial. *Diaz*, 653 F.3d at 588. "Under the direct method of proof, the plaintiffs are not required to rebut a defendant's non-discriminatory reason for the adverse employment action, as they must under the indirect method." *Id*. The defendant is entitled, of course, to present its rationale to a jury to defeat the plaintiff's discrimination claims, but it is insufficient to prevail at summary judgment. *Id*.

To establish a prima facie case of discrimination using the indirect method, a plaintiff must offer evidence that: "(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir.

2012) (citation omitted). If the plaintiff can do this, a presumption of discrimination is triggered, and the employer must then articulate a legitimate, non-discriminatory reason for its action. *Id*. Once it does, "the burden shifts back to the plaintiff, who must present evidence that the stated reason is a 'pretext,' which in turn permits an inference of unlawful discrimination." *Id*. (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973). Pretext is "more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Silverman v. Board of Educ. Of City of Chicago*, 637 F.3d 729, 742 (7th Cir. 2012) (original alteration)(citation omitted). If the decision maker "honestly believed the non-discriminatory reason it proffered, the reason was not pretextual." *Id*.

With respect to the IIT claimants, the EEOC relies on both the direct and the indirect methods for all of its discrimination and retaliation claims, save its failure to promote claims, for which it relies only on the indirect method. With respect to the Thornwood claimants, the EEOC relies on the indirect method for its termination claim on behalf of Flores. (Although the EEOC's "overtime" claims on behalf of the Thornwood claimants also seem to be in the nature of discrimination claims--as opposed to retaliation or harassment--the EEOC does not identify the method of

proof under which it proceeds, nor does its argument reference the elements of either approach.)

To establish a prima facie case of anti-Hispanic harassment, the EEOC must prove that as to each claimant asserting such a claim, "his or her work environment was both subjectively and objectively offensive; one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002) (internal quotation marks and citations omitted). The EEOC must further show that the harassment was based on the claimants' national origin; that it was severe or pervasive; and that there is a basis for employer liability. *Id*. The final element requires a plaintiff to establish that the employer had "actual or constructive knowledge of the harassment and failed to address the problem adequately." *Knox v. State of Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996)(citing cases).

The foregoing are the basic principles that inform my analysis of the EEOC's various claims. Before turning to the individual claims asserted on behalf of the IIT claimants, however, I pause briefly to address collectively its discrimination claims based on defendants' alleged failure to promote five Hispanic janitors at the IIT site (Alvarez, Del Toro, Teodoro Medina, Obregon, and Rosales). Because the EEOC has uniformly failed to present sufficient evidence to raise an inference of discrimination as to

any of these claims, they are appropriate for summary judgment in a single stroke.

### III. The IIT Failure-to-Promote Claims

All of the EEOC's failure-to-promote claims assert that the claimants were promoted from call-in to permanent "status" more slowly than similarly-situated African-American janitors, if at all. The elements of a prima facie failure-to-promote claim are that the claimant: 1) was a member of a protected class; 2) was qualified for the position; 3) was rejected for the position; and 4) that the position was given to a person outside the protected class who was similarly or less qualified than the claimant. But rather than identify evidence to establish that any claimant was passed over for any specific position, the EEOC relies on quasi-statistical evidence that simply does not, standing alone, raise an inference that these claimants were discriminatorily denied a promotion.

Indeed, the EEOC's theory is not that these claimants were passed over for specific positions, but instead that they remained in call-in "status" longer than similarly situation African-American employees before being promoted to permanent "status." But even assuming that a transfer to any permanent position represents a promotion for any call-in employee (ignoring, for the

moment, the EEOC's opposite argument with respect to one claimant), there is no evidence that defendants promoted any employee from one "status" to the other; instead, defendants promoted call-in employees to specific permanent positions that became available to them. It may be possible to hypothesize a claim based on the EEOC's theory—if, for example, defendants' stated policy were to promote call-in employees to permanent "status" after a certain amount of time (independently of whether the employees also changed positions), and the evidence suggested that Hispanics had to wait longer than non-Hispanics to receive such promotions—but that is not this case.

Accordingly, to avoid summary judgment of its failure-to-promote claims, the EEOC must establish each element of a prima facie case with respect to each claimant. Yet, with respect to two claimants (Del Toro and Medina), the EEOC does not identify any position at all for which the claimants actually applied, asserting instead simply that they were "interested" in permanent positions. With respect to other claimants, the EEOC does not identify the individuals allegedly given positions for which the claimants assert they were qualified but rejected. These omissions make it impossible to infer that the claimants were not promoted to any permanent position in favor of similarly or less qualified, non-Hispanic candidates.

Moreover, on the issue of qualification, the EEOC appears to equate "qualification" with "seniority," since the only evidence it points to in support of the second and fourth elements of its prima facie case--that the claimants were qualified for certain positions, but that those positions were given to less qualified individuals outside the protected group--compares the claimants' "seniority," based on their hire and promotion dates (the latter being the date, if any, on which they obtained a permanent position), with the seniority of certain African-American employees. This is puzzling, in the first instance, because by the EEOC's own account, call-in employees do not accumulate seniority at all. Pl.'s Rule 56.1 Stmt. ¶ 20 ("Unlike permanent janitors, call-in employees did not accumulate seniority.") So the claimants' putative "seniority" over the asserted comparators is an awkward basis for comparing qualifications.

Next, the EEOC seems to imply, with the assertion that the permanent positions these claimants desired were "low-skill positions," that, seniority aside, all employees were equally qualified for any permanent job that became available. But the EEOC's own evidence belies this inference, since the duties associated with the job postings in the record were not uniform across different janitorial positions. Compare, for example, the job posting for the "housekeeping" position identified at page 2 of Exhibit 102 to Plaintiff's Rule 56.1 Statement (listing duties),

with the posting for the "custodian" position identified at page 12 of the same exhibit (describing different and additional duties, including "background of at least one year in housekeeping.") (DN 153-11). This is consistent with the collective bargaining agreement between RJB and the local SEIU union, which makes clear that while seniority may be the primary factor, individual ability also plays a role in determining whether an employee is qualified for a particular position. The agreement identifies seniority as "the governing factor," in filling job vacancies, but only "*provided the employee has the ability to be trained to perform the job.*" Def.'s L.R. 56.1 Stmt., Exh. 37 (DN 134-3) at 17. (Emphasis added). Moreover, the same provision specifies that vacant positions can be offered to "qualified replacement [i.e., call-in] employees" *only in the event they are not filled by permanent employees*.[5] (Emphasis added)

For at least the foregoing reasons, the EEOC cannot raise an inference of discrimination based solely on the length of time these claimants, as compared to certain African-American employees, remained in call-in status before being promoted to permanent

_____

[5]A Memorandum of Understanding ("MOU") between RJB and the union articulates an exception to this rule, however, for "secondary positions." A "secondary position" is one that is created when a janitor who had successfully bid on an open spot vacates that position. Pursuant to the MOU, RJB was not required to post "secondary" positions, but instead to award them to "the most qualified replacement employee working in the employer's buildings." Def.'s L.R. 56.1 Stmt. ¶ 14.

positions.[6]  There are simply too many other factors bearing upon the issue (whether any permanent positions became available to call-ins at the relevant time; whether the claimants actually applied for any available permanent positions; the requirements of any specific positions applied for; the claimants' substantive qualifications or "ability to be trained" for those positions; and the qualifications of the alleged comparators, to name a few), which the EEOC fails entirely to address, for such an inference to be reasonable.

Nor can the EEOC discharge its prima facie burden merely by pointing to evidence that certain permanent positions were not posted before being awarded to African-Americans.  The EEOC argues that defendants' failure to post a handful of vacant positions (the

---

[6]Nor is the EEOC's comparison between the amount of time the claimants spent as call-in employees and the amount of time certain, selected African-American employees spent as call-ins, meaningful statistical evidence.  While it is true that "comparative evidence of systematically more favorable treatment toward similarly situated employees not sharing the protected characteristic" may be sufficient to establish a triable issue of intentional discrimination, *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 522 (7th Cir. 1994), the EEOC's proffered evidence suggests no such systematic treatment.  The EEOC identifies, among nearly 200 African-American janitors employed at IIT during the relevant period, under thirty African-American comparators promoted more quickly than claimants, but omits any evidence or discussion of how long the remaining roughly 170 African-Americans spent as call-ins, nor does it attempt to compare the promotion rates of Hispanic employees versus African-American employees as a whole.  I agree with defendants that the EEOC's cherry-picked data is insufficient to raise the statistical inference that defendants systematically allowed Hispanic employees to languish in call-in positions while promoting similarly situated African-American employees to permanent positions.

EEOC does not allege an exact number but identifies four such positions specifically and refers vaguely to several more) before awarding them to African-Americans is sufficient to raise an inference of discrimination against Hispanics, citing *Loyd v. Phillips Bros*., Inc., 25 F.3d 518 (7th Cir. 1994). But the EEOC's reliance on *Loyd* is misplaced.

In *Loyd*, the evidence established that the defendant's employees were classified into three categories (which, for ease of reference, I will call A, B, and C). "A" employees earned the highest salaries, followed by "B"s, then "C"s. The evidence further revealed that all "A"s were male, all "B"s were female, and all "C"s were male. Both "B"s and "C"s were supposed to be equally eligible for promotion to become "A"s, but while "C"s were routinely solicited for, and received, such promotions (no applications were necessary), neither the plaintiff (a "B"), nor any other "B" was ever approached for, or obtained, an "A" position. Indeed, on one occasion, when an "A" position became available and no "C"s were interested, the defendant hired a man from outside the company, despite the defendant's stated preference for hiring from within. Meanwhile, there was no dispute that the plaintiff was qualified for an "A" position.

On these facts, the Seventh Circuit concluded that the plaintiff had established a prima facie case of discrimination, regardless of whether she had affirmatively expressed interest in

obtaining an "A" position. As the court put it, "Loyd wonders why she should be required to actively pursue a promotion when her male colleagues are not. So do we." *Id.* at 522. The court explained that no such showing was necessary to close the "causal gap" between the defendant's decision-making process and the plaintiff's failure to obtain an "A" position. Indeed, it was apparent from the record that the defendant systematically and intentionally excluded qualified women from consideration for "A" positions.

But that is far from the scenario here. There is no dispute that many Hispanic employees held permanent positions, including most of those asserting a failure-to-promote claim, and indeed, one claimant (Rodriguez) who the EEOC claims obtained an unposted permanent position without ever working as a call-in.

Based on the foregoing, I conclude that the EEOC has not carried its prima facie burden as to any of its failure-to-promote claims. I now turn to the EEOC's remaining claims, which I address on a claimant-by-claimant basis, except as to claimants Chavez, Mendoza, and Sergio Medina, and claimants Tony Wesley and Todd Jackson, whose claims I address together.[7]

## IV. The IIT Individual Claims

### A. Chavez, Mendoza, and Sergio Medina

---

[7]Because the EEOC asserts only a failure-to-promote claim on behalf of Eva Alvarez, the foregoing section disposes of the entirety of her claim.

The EEOC asserts claims for discriminatory termination on behalf of these claimants, all of whom were terminated following events that occurred on the night of April 26-27, 2007.[8]  For the reasons that follow, I conclude that the EEOC is entitled to a trial on these claims.

Defendants argue that Chavez, Mendoza, and Medina,[9] all of whom were assigned to the night shift in IIT's Life Sciences building, were terminated for sleeping on the job and for job abandonment on the night in question.  They cite evidence that at the time these claimants were terminated, RJB was on notice that it would have to cure ongoing problems with the janitorial service it provided to IIT or risk losing the contract.  *See* Feb. 21, 2007, "cure letter" from J. Clemens to R. Blackstone, Def.'s L.R. 56.1 Stmt., Exh. 69 (Feb. 21, 2007) (DN 136-14).  Defendants also cite an email from February 8, 2007, in which IIT told RJB, through Tony Wesley, that "the janitorial service for Life Science has gotten to a totally unacceptable level." Def.'s L.R. 56.1 Stmt., Exh. 63 (DN 136-9).  In response to this situation, defendants argue, RJB "raised the bar for employee performance," stating that thirty-two written warnings were issued to Hispanic and African-American janitors alike in the three-month period following RJB's receipt of

_____

[8]The claimants grieved their terminations with the union, after which Mendoza, but not Chavez or Medina, was reinstated.

[9]In this section, "Medina" refers to Sergio Medina.

25

IIT's "cure letter." Def.'s Reply, 46 (DN 166).  Defendants then describe a quality-control visit to the Life Sciences building conducted by RJB managers and supervisors Shumpert, Gant, Bass, and Holliday on the night of April 26-27, 2007, and argue that their discovery of Chavez, Medina, and Mendoza in circumstances that suggested they were sleeping, or otherwise failing to perform their assigned tasks, is what prompted their termination.  Defendants further point out that Robert Dix, an African-American janitor, was likewise terminated for sleeping on the job just two weeks earlier.

Each of the claimants and numerous RJB employees have testified in detail about the night in question. In their briefs, both sides identify and bring to the fore a host of inconsistencies in the other side's evidence.  Indeed, my review of the record reveals a number of inconsistencies, both among the various witnesses' testimony, and, in some instances, across the statements individual witnesses made at various times.  At bottom, however, the claimants all testify that they were not, in fact, sleeping, or doing anything other than working, on the night in question, and, as discussed below, the EEOC presents at least some evidence that would "permit a jury to infer that discrimination motivated" their termination.  *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582 (7th Cir. 2011).

Several witnesses testified that Shumpert--who was undisputedly involved in these claimants' termination--frequently

used language, including during management meetings, that suggested hostility towards Hispanic employees, *see*, e.g., Wesley Dep., Def.'s L.R. 56.1 Stmt., Exh. 57 at 86:7-22 (DN 137-4); Patterson Dep., EEOC Supp. Exh. at 73:3-74:8; 77:19-78:3, 236:19-237:2 (DN 182); that Shumpert had said, in the month before these terminations, that she wanted to "get rid of some of the Mexicans" at IIT, specifically including Chavez, Mendoza, and Medina, *see* Jackson Aff., Pl.'s L.R. 56.1 Stmt., Exh. 6 at ¶2 (DN 153-1); and that Shumpert had contrived the "lie" that she caught these claimants sleeping as an excuse for firing them. *Id.* ("She suggested that I plant drugs on them, or say that I caught them sleeping or violating the dress code"); *see also* Patterson Dep., EEOC Supp. Exh. at 121:5-18; 111:22-112:2 (DN 182-1) (explaining her basis for believing Shumpert's statement that she caught claimants sleeping was a "lie").

The EEOC also points to the suspicious content and circumstances surrounding two, successive incident reports that RJB obtained from IIT's public safety service about the night in question. Pl.'s L.R. 56.1 Stmt., Exh. 61-62. Specifically, the EEOC notes that while Shumpert represented during union grievance proceedings on May 14, 2007, that she had an incident report corroborating her version of that night's events, both of the reports purporting to memorialize the events are dated June 7, 2007. Indeed, the public safety officer who was present that

evening testified at his deposition that the report was not written contemporaneously with the events, and further testified that he did not personally write the reports; that they do not reflect what he told his supervisor; and that although the reports are signed in his name, the signature appearing at the bottom is not his. Def.'s L.R. 56.1 Stmt., Exh. 62 at 31:11-335 (DN 136-8). Even more significantly, the officer's testimony flatly contradicted key facts stated in the reports, such as that the officer had heard Medina admit that he had been sleeping. *Id*. at 28:16-18.

Taken together, I conclude that the EEOC has presented sufficient direct and circumstantial evidence to withstand summary judgment using the direct method of proof. Defendants are free, of course, to present their evidence that Chavez, Mendoza, and Medina were terminated for legitimate, non-discriminatory reasons at trial; but the EEOC is not required, at this stage, to rebut that evidence to raise an inference of discrimination. *Diaz v. Kraft Foods Global, Inc*., 653 F.3d 582, 588 (7th Cir. 2011).

## B. Gladys Navarro

It is somewhat difficult to ascertain the precise theory or theories of discrimination the EEOC asserts on behalf of Gladys Navarro. In its memorandum setting forth Navarro's[10] prima facie case, the EEOC identifies only claims of harassment and retaliation. Yet, most of the evidence the EEOC cites in support

---

[10]In this section, "Navarro" refers to Gladys Navarro.

of its claims is neither inherently threatening, nor overtly hostile, nor does it relate to any discrete, adverse employment action. Instead, the bulk of the EEOC's evidence merely chronicles Navarro's perception of inequitable treatment between herself and her African-American colleagues, which suggests a theory of discrimination based on disparate treatment. Indeed, the EEOC does not dispute defendants' factual statement that the EEOC makes "a litany of disparate treatment claims" on Navarro's behalf. Pl.'s Resp. To Def.'s L.R. 56.1 Stmt. IIT, ¶ 164 (DN 185).

At the same time, however, the EEOC concedes that in the six years Navarro was employed by RJB at the IIT site (where she continues to work for the company that now provides IIT's janitorial services), she was never fired or demoted; her pay and benefits were never reduced; and she was never transferred to a less desirable position. In other words, setting aside for a moment her three-day suspension, the EEOC concedes that Navarro did not suffer any specific adverse employment action. Instead, the EEOC argues that its evidence of disparate treatment supports Title VII liability on the theories of harassment and "retaliatory harassment," the latter of which has been recognized, for example, in *Knox v. State of Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996). On these theories, the only way EEOC can establish that RJB's conduct rose to the level of actionable discrimination is through evidence that Navarro was harassed on the basis of her national

origin (which, in this context, may include evidence that she was "exposed to disadvantageous terms or conditions of employment to which [non-Hispanics] were not exposed," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80,(1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J. concurring))), and that the harassing conduct was severe or pervasive. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)("[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII. ... [T]o be actionable, [harassment] must be sufficiently severe or pervasive.") (internal citations and quotation marks omitted). To the extent the EEOC claims "retaliatory harassment," it must also establish a basis for inferring a causal nexus between Navarro's protected activity and harassing conduct that meets the criteria above.

To this end, the EEOC argues that RJB engaged in a "campaign of harassment" against Navarro. The EEOC cites evidence that: 1) Navarro, but not her African-American co-workers, was required to do extra work; 2) Navarro, but not her African-American co-workers, was required to respond to calls during her lunch breaks without pay; 3) Navarro's requests for help were denied, while the requests of her African-American co-workers were granted; 4) Navarro's name was removed from the "bid sheet" for a vacant position, which was then awarded to an African-American janitor with less seniority

than Navarro; 5) Navarro, but not her African-American co-workers, received disciplinary warnings for wearing jewelry at work; 6) Navarro received three warnings on May 26, 2006, eleven days after she filed a charge of discrimination with the Illinois Department of Human Rights, while African-American janitors who had not filed discrimination claims, and who had engaged in misconduct similar to that attributed to Navarro, were not similarly disciplined; 7) Navarro was suspended for three days in July of 2006 for violating RJB's rule prohibiting employees from speaking to the client about company business; 8) Shumpert forced Navarro, but no other employee, to wait outside the office to punch in and out for work, including in the winter time, saying "let that bitch freeze"; 9) Navarro's supervisor failed to provide Navarro with protective gear on one occasion while she used strong cleaning products, but provided protective gear to African-American janitors on the same assignment; 10) Navarro was denied opportunities to work overtime, while African-American co-workers who had less seniority than she were given overtime; and 11) Navarro was called "derogatory names." The EEOC adds to this tally allegations that Shumpert and Ron Blackstone both disliked Navarro and wanted to terminate her because, among other reasons, she was a "pest" who had "repeatedly sued" Blackstone.

Because only discrimination that is "based on" a protected characteristic violates Title VII, I may begin by examining the

evidence relating to each of the incidents above to determine whether, when viewed in the light most favorable to the EEOC, it reasonably supports the inference that Navarro was subjected to the complained-of conduct *because* she is Hispanic. *See Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975-76 (7th Cir. 2004). Eliminating those instances in which it does not, I may then turn to the remainder to consider whether the harassing conduct was sufficiently severe or pervasive to be actionable, and whether, in view of all the circumstances, it resulted in a working environment that was both subjectively and objectively hostile. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998).

The EEOC's argument that discriminatory harassment can be inferred from evidence that Navarro was "deprived" overtime opportunities; "denied" a bid for a lateral transfer; disciplined for wearing jewelry; and refused protective equipment can all be disposed of in short order. As to the first, the EEOC does not identify a single, specific, instance in which Navarro requested overtime but was wrongly passed over for the opportunity in favor of an African-American janitor. The whole of the EEOC's argument appears to be that national origin-based discrimination can be inferred merely from evidence that Navarro worked fewer overtime hours than two African-American janitors, Yolanda Pugh and Lisa (sometimes referred to as Pelissar) Hoskins, both of whom had less seniority than Navarro. But there is nothing inherently

discriminatory or harassing in awarding some employees more overtime work than others, and the EEOC cites no evidence to explain why such an inference is warranted. The EEOC makes no comparison, for example, between the availability of Navarro or her putative comparators to work overtime shifts when the opportunity arose, nor does it mention the frequency with which either she or they requested such shifts. There is simply no basis from which reasonably to conclude, based on the EEOC's evidence, that RJB harassed Navarro because of her national origin by wrongfully denying her overtime opportunities.

As to RJB's alleged "denial" of Navarro's bid for a transfer, it is undisputed that the transfer Navarro sought was for a position on the same shift, and for the same pay, hours and benefits. Accordingly, the EEOC sensibly does not argue that Navarro's non-transfer amounted to an adverse action. The EEOC nevertheless insists that the selection of an African-American janitor for the position (who, it is undisputed, left the position after a few weeks, and was replaced, successively, by two Hispanic janitors, one of whom was Navarro's brother, claimant Elqui Navarro) reveals an intent to harass Navarro. In support of this inference, the EEOC relies on evidence that "somebody" crossed Navarro's name off the bid sheet (Navarro admits she does not know who), and that when Navarro grieved the issue, RJB "falsely accused" Navarro of removing her own name from the list, then "said

she did not get the job because her name was crossed off the list."
Pl.'s L.R. 56.1 Stmt. ¶ 315. This evidence does not remotely
support an inference of discriminatory animus. To begin with, two
of the three exhibits the EEOC cites (EEOC Exhs. 78 and 79) do not
even relate to Navarro's claim that she was wrongfully denied a
transfer.[11] Moreover, the EEOC offers no evidence that the decision
maker (whom the EEOC does not identify) knew that in fact, someone
other than Navarro had crossed off her name, or that the decision
was otherwise in bad faith. And even assuming that RJB's stated
basis for declining to transfer Navarro was mistaken or even
pretextual, the evidence does not plausibly suggest that the real
reason it declined her request for a lateral transfer, to a
position that offered her no material advantages over the one she
then held, was an intent to harass her because she is Hispanic.

In support of its claim that RJB inequitably enforced its
uniform policy against Navarro as part of a campaign to harass her,
the EEOC cites evidence that Navarro was reprimanded for wearing
jewelry while similarly-situated African-American janitors were
not. Again, the EEOC does not argue that these reprimands

---

[11]I have previously noted errors and omissions in the parties'
citations to the exceptionally voluminous record in this case, and
I admonished them that I would not scour the record in attempt to
locate support for their factual statements. *See* DN 181.
Nevertheless, I suspect that the EEOC intended to cite the
documents identified as EEOC Exhs. 80 and 81. If that is so, I
note that that EEOC's characterization of RJB's stated basis for
denying Navarro's transfer sorely misrepresents the evidence.

materially altered the terms or conditions of Navarro's employment, but asserts instead that they reveal defendants' intent to harass Navarro based on her national origin.  Its evidence again falls short.  First, the reprimands were issued by Patricia Figueroa, who is Hispanic (although, of course, no "conclusive presumption" of non-discrimination attaches to that fact, *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998)), and who the EEOC does not claim discriminated against Hispanics, undermining any inference that the allegedly inequitable application of RJB's uniform policy was based on Navarro's Hispanic origin.[12]  Moreover, the EEOC offers no evidence that these reprimands were issued in conjunction with language or conduct that suggested anti-Hispanic animus, or were influenced by individuals claimed to harbor such animus.  In any event, the EEOC cites no case in which this sort of perceived inequity was deemed actionable harassment.[13]

---

[12]Navarro has complained in other proceedings that Figueroa discriminated against her on the ground that Navarro is Peruvian, but the EEOC does not raise that claim in this case.

[13]For the general proposition that "inequitable discipline" can contribute to a hostile work environment, the EEOC cites (though not in conjunction with Navarro's claim specifically) *Che v. Massachusetts Bay Transportation Authority*, 342 F.3d 31 (1st Cir. 2003).  But among other factual differences between that case and this one, the discipline at issue in *Che* was a demotion, which itself constitutes an adverse action.  *Che* does not stand for the proposition that any discrepancy in the application of work rules, even where no tangible job consequences are implicated, supports a claim for harassment.

Finally, with respect to the "baseboard incident," the EEOC points to Navarro's testimony that she asked for, but was denied, the use of a mask while using a strong-smelling cleaning product, while the African-American janitors on the same assignment were given such equipment, and argues that this testimony evidences defendants' campaign of harassment against Navarro. The parties dispute whether Jeff Bass, the supervisor overseeing the assignment, offered Navarro a mask, and whether he told Navarro to stop working when the fumes from the product the janitors were using became very strong. But these factual disputes are not material to the EEOC's harassment claim because even if Navarro's testimony is credited, there is simply no evidence at all from which to infer that a discriminatory animus motivated Bass's conduct. While it is undisputed that Navarro became sick after exposure to the cleaning product on this occasion, it is likewise undisputed that Navarro had used the product on previous occasions without any adverse consequences, and there is no evidence that Bass anticipated or intended Navarro's reaction. And again, the EEOC does not claim that the incident was accompanied by any derogatory language or conduct. Accordingly, there is no evidence that Bass's actions, even as Navarro described them, were intended to harass Navarro because of her national origin.[14]

_____

[14]This is true even if I assume, as the EEOC elsewhere asserts, that on other occasions, Bass expressed a bias against Hispanics. Because there is no evidence that Bass intended or even suspected

I now turn to the EEOC's claim that RJB harassed Navarro by giving her "more work" and "less help" than her African-American colleagues. The Seventh Circuit has frequently remarked that courts do not sit as a "super-personnel department," and that our authority under federal anti-discrimination law is limited to correcting employment decisions that are discriminatory. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006). As noted above, Title VII simply does not protect employees from every decision an employee perceives as unfair. *See id.* Accordingly, the EEOC must provide some basis from which a fact-finder reasonably could conclude not only that Navarro was required to work harder than her colleagues, but that her heavier workload was motivated by discriminatory animus, and that it materially affected the terms and conditions of her employment. *See Minor v. Centocor, Inc.*, 457 F.3d 632, 643 (7th Cir. 2006) ("extra work" was a material difference in the terms and conditions of employment where the increased workload resulted in the functional equivalent of a twenty percent reduction in the plaintiff's hourly pay).

The EEOC does not contend that Navarro was required to do work outside the scope of her job duties, or, with one exception, that

---

that Navarro would suffer harm in this instance, his actions towards her simply cannot be construed as objectively hostile or abusive, much less that they were motivated by his alleged bias.

she was required to work extra without additional pay.[15]  It claims, however, that national origin-based harassment can be inferred from evidence that Navarro, who worked the morning shift, had to clean up areas or perform tasks that should have been taken care of by the previous night shift (which, it is undisputed, comprised both Hispanic and African-American workers); that Navarro was periodically called upon to vacuum part of a building for which Hoskins was responsible; that Navarro was required to shovel snow outside her buildings while Pugh was not; and that Navarro alone, among all of the day shift janitors, was called to respond to issues during her lunch break.

The EEOC's first argument is that RJB harassed Navarro, because she is Hispanic, by requiring her to do "extra" work by herself, in an unreasonably short period of time, rather than divide the work between Navarro and "her African-American coworkers."  The EEOC does not identify any "African-American coworkers" in particular, and it is undisputed that Navarro was the only janitor assigned to her buildings.  It is not as though Navarro claims to have been required to clean up after the night shift in her buildings by herself, while specific, African-American

---

[15]Navarro's claim that she was required to work during her lunch break without additional pay could, under *Minor*, be construed to implicate the material terms of her employment.  Nevertheless, as discussed below, Navarro's claim fails for the same reason the *Minor* plaintiff's claim failed: the evidence fails to provide a basis for concluding that Navarro was targeted for extra work on the basis of her membership in a protected class.

janitors assigned to the same buildings sat idly by, nor does the EEOC offer any evidence to suggest that any African-American janitor assigned to any other building was available, but not required, to help Navarro at the time. To the extent the EEOC's vague reference to Navarro's "African-American coworkers" is intended to identify Hoskins and/or Pugh, Navarro's subjective belief that these employees were required to do less work than she in their respective buildings is simply not, standing alone, a sufficient basis from which to infer that Navarro's own work assignment was driven by an intent to harass her because she is Hispanic. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 549 n. 11 (7th Cir. 2002) (plaintiff's subjective belief, without more, "cannot prove that an action was inspired by improper motivations.") Indeed, any such inference is particularly weak given that the complained-of decisions about work distribution were made by Patricia Figueroa, who, again, the EEOC does not claim discriminated against Hispanics.

The EEOC's citation to the testimony of IIT employee John Clemens, who supervised RJB's contract with IIT, is of little help. While Clemens testified that, in his opinion, Navarro had more buildings and a heavier work load than Hoskins, he also noted that Hoskins had "higher profile buildings," which included the president's office. Moreover, Clemens apparently did not perceive the employees' disparate workloads as discriminatory, since he

specifically testified elsewhere in his deposition that he did not observe any form of discrimination by RJB during the time he supervised the contract. Taken as a whole, Clemens' testimony does not bolster the EEOC's claim that Navarro's work load was discriminatory, but instead underscores why routine employment decisions about such matters as work allocation are not generally appropriate for judicial intervention. *See Ptasznik*, 464 F.3d at 697.

The EEOC's remaining arguments about "extra work" and lack of help fail to support Navarro's hostile environment claim for similar reasons, and they need not be examined individually in detail. With respect to each incident, the evidence on which EEOC relies simply does not provide a reasonable basis from which to infer that Navarro's work assignments were motivated by a discriminatory or retaliatory animus.[16]

Having concluded that the EEOC's evidence relating to the foregoing incidents fails to raise a reasonable inference that RJB

---

[16]With respect to EEOC's claim that Navarro was called to work during her lunch break, Navarro filed a union grievance on the issue, which resulted in the agreement that Navarro would respond to such calls, but would be allowed to resume her break after she finished the assignment. That Shumpert was allegedly "mad, mad, mad" after Navarro filed the grievance and called her a "fucking bitch" may well demonstrate Shumpert's hostility toward Navarro, but it does not suggest that Navarro was, as the EEOC claims, called to work during her lunch break in the first place on account of discriminatory or retaliatory animus. The EEOC offers no evidence to suggest that Shumpert, or anyone else alleged to harbor such an animus, was responsible for requiring Navarro to work during her break.

harassed Navarro on the basis of her national origin, I now turn to the remaining incidents the EEOC cites in support of Navarro's retaliation and harassment claims: the issuance of multiple warnings in one day, accompanied by the use of derogatory, offensive or threatening language during a meeting with Angela Shumpert and Patricia Figueroa; a three-day suspension without pay; and forcing Navarro to wait outside in the cold. Because these all occurred after Navarro filed her charge of discrimination, I consider whether the EEOC's evidence relating to these incidents is sufficient to establish a prima facie case of either retaliation or harassment (including retaliatory harassment).

The EEOC asserts that on May 26, 2006, eleven days after Navarro filed a charge of discrimination with the IDHR, in which she claimed that Patricia Figueroa and RJB discriminated against her based on her national origin, Shumpert called Navarro and Figueroa to a meeting in her office. According to Navarro's testimony in this case (which RJB argues at length, and in detail, is inconsistent with her previous statements, but which for now I must, and do, credit), Shumpert called Navarro "stupid" during this meeting and asked her why she had filed the grievance. Navarro further testified that at one point, Shumpert stood up, raised her voice, and hit the table, saying "fuck...it's always the Hispanics who come to make trouble." G. Navarro. Dep., Def.'s L.R. 56.1 Stmt., Exh. 8 at 200:12-201:3 (DN 133-11). Then, following a

disputed incident in which Navarro claims that Shumpert demanded to take Navarro's phone, Shumpert allegedly called her a "fucking bitch" and said to RJB's secretary, Leticia Archibald (who was also present for the meeting) "give this bitch the warnings, right now. I don't ever want to see her again here." *Id*. 201:17-202:8. Shumpert also called Hispanics "wetbacks" during this meeting and said they were "a bunch of animals." *Id*. at 202:12-16, 258:6-7. Immediately after the meeting, Navarro complained to IIT's John Clemens about Shumpert, and told him that she had been fired.

Navarro did, in fact, receive three warnings on May 26, 2006. The first was an oral warning for violating RJB's confidentiality policy by complaining to Clemens about her meeting with Shumpert. The second was a written warning for insubordination in the course of the disputed telephone incident, in which RJB claims that Navarro was using her telephone during the meeting after being told to turn it off. The third was a second written warning for signing in and out at the same time on the morning of the May 26 meeting with Shumpert, which Navarro denies that she did. The EEOC argues that the context in which Navarro's written warnings were issued, including Shumpert's hostile and derogatory remarks, supports the inference that they were "due to [Navarro's] ethnicity and in retaliation for filing a charge of discrimination."

I agree that that inference is plausible. Nevertheless, the EEOC concedes, as it must, that the warnings themselves did not

42

alter the terms or conditions of Navarro's employment. *Oest v. Illinois Dept. Of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001) (oral or written reprimands under employer's progressive discipline system did not implicate "tangible job consequences" even though each brought employee one step closer to termination). Accordingly, even assuming the warnings were motivated by a discriminatory or retaliatory animus, EEOC still must establish that a reasonable fact finder could conclude that the warnings created, or at least contributed to, a hostile working environment. Because determining whether an environment is hostile or abusive requires an inquiry into all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1992), I turn to the remainder of the incidents before passing on this question.

On July 11, 2006, Figueroa issued Navarro a three-day suspension without pay for violating RJB's confidentiality policy after she (Figueroa) received a report from IIT personnel that Navarro had been discussing RJB-related issues with IIT students or staff. The EEOC asserts that this suspension supports both its straightforward retaliation claim (which it argues it can prove

43

under either the direct or the circumstantial method), and its claim of retaliatory harassment. I disagree on both fronts.

The EEOC's retaliation claim fails under the direct method because it has neither direct, nor circumstantial evidence to support a causal connection between Navarro's statutorily protected activity and her suspension. First, the EEOC does not controvert Figueroa's testimony that it was she (in consultation with Karen Cash in human resources), who made the decision to suspend Navarro. The EEOC emphasizes evidence that Shumpert and Blackstone made statements in the months preceding Navarro's suspension that suggested both a desire to terminate her and a discriminatory and/or retaliatory animus. But these statements are neither direct nor indirect evidence that discrimination motivated Navarro's suspension, since there is no basis in the record for concluding that either Shumpert or Blackstone was involved in Navarro's suspension. The EEOC's suggestion to the contrary is sheer speculation.

Nor does the timing of Navarro's suspension amount to convincing circumstantial evidence of discrimination. While the suspension came two months after Navarro's discrimination charge, there is no dispute that intervening events--Figueroa's receipt of a report from IIT staff that Navarro had been discussing RJB-related issues with IIT students or staff, after having been warned that such conduct violated RJB's confidentiality policy--provided

an independent, legitimate, and non-discriminatory basis for Figueroa's action.[17] The EEOC's assertion that Navarro was the only RJB employee ever to have been suspended for violating RJB's confidentiality policy likewise does not contribute to a "convincing mosaic" of circumstantial evidence, since it does not point to any other employee who similarly violated the policy on multiple occasions.

For the foregoing reasons, the EEOC has not raised the inference, under the direct method, that Navarro's suspension was retaliatory. Its prima facie case under the indirect method fails for at least the reason, noted above, that it has not identified any comparators or otherwise come forward with evidence to suggest that RJB's stated basis for her suspension was pretextual.

I now turn to the remaining element of Navarros' harassment claim: that in 2007, Shumpert forced Navarro to wait outside the office to sign in for work every day, including in the winter, and that Navarro heard her say, on one occasion, "let that bitch freeze," or "I don't want to see you, fucking bitch." In her

---

[17]I am mindful that under the direct method, the EEOC need not, at this juncture, rebut RJB's evidence of a legitimate basis for its action. I refer to this evidence not to support a conclusive finding that Navarro's violation of RJB's confidentiality policy, and not retaliation, was, in fact, what motivated her suspension. The point here is that Figueroa's uncontroverted testimony that she received a report about Navarro's misconduct in the interim between Navarro's discrimination charge and her suspension undercuts the EEOC's argument that the *timing* of the events is suspicious and therefore amounts to indirect evidence of discrimination.

deposition in this case, Navarro testified that she could not remember when she began having to wait outside, but that she had to do it every day "until about when Mark [Bonk] came in" (i.e., in May of 2007). The EEOC emphasizes that Shumpert admits she "instructed people not to let Navarro enter the office," but defendants counter that Shumpert further explained that she expected Navarro to take "an alternate route" around the office "to the door which was located 10 feet away" to get whatever she needed, rather than interrupt business. Defendants also insist that Navarro's testimony in this case cannot reasonably be credited in view of her earlier statement, in a complaint she filed with the IDHR in June of 2007, that Shumpert required her "to enter and exit the office through the back door," beginning on "April 17, 2007."

At this stage, I may not make credibility judgments, and thus must accept Navarro's testimony as true to the extent a reasonable jury could do so. In any event, regardless of whether Navarro was forced to "wait outside" until Shumpert left the office, or merely to take "an alternate route" around the office while Shumpert was there, there is no dispute that Shumpert singled Navarro out as a *persona non grata* in RJB's office for at least several weeks in April of 2007. The question is whether this state of affairs, combined with the events of May 26, 2006 (which, as previously discussed, is the only other circumstance that could, as a matter of law, support Navarro's harassment claim), resulted in a working

environment that a reasonable employee would consider so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [] employment and create an abusive working environment." *Harris v. Forklift Sys. Inc*., 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).

The EEOC seems to suggest, through its citation to *Cerros v. Steel Technologies*, Inc., 398 F.3d 944 (7th Cir. 2005) that RJB's conduct was "severe" because Shumpert called Navarro a "wetback," in her presence and referred to her by other derogatory terms to others. *See id. at* 950-51 ("an unambiguously racial epithet falls on the more severe end of the spectrum"). But the *Cerros* court also acknowledged that the "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII," and indeed, the Seventh Circuit has elsewhere recognized that "an objectively hostile work environment is not produced "where most of the offensive comments giving rise to the claim were not directed at the plaintiff, and those that were directed at plaintiff were isolated." *Whittaker v. Northern Illinois University*, 424 F.3d 640, 645 (7th Cir. 2005) (citations omitted). Here, Navarro testified that the only time she heard Shumpert use explicit racially offensive terms was during the May 26, 2006, meeting. The EEOC cites no authority holding that the use of such terms on one

occasion across six years of employment is sufficient to support a claim of harassment based on national origin.

Of course, Shumpert also directed other offensive comments at Navarro that did not explicitly reference her national origin, and the EEOC correctly argues that not every offensive remark must be facially discriminatory to support an actionable claim of harassment. *Shanoff v. Illinois Dept. of Human Services*, 258 F.3d 696, 705 (7th Cir. 2001). But even if I include the other remarks Navarro testified to (that Shumpert called her "bitch" or a "fucking bitch" after Navarro filed the grievance over being required to work through her lunch break, and another time while Navarro waited outside the office to sign in), the EEOC is still left with only a handful of incidents, over the six years of Navarro's employment with RJB, in which Shumpert called Navarro an offensive name in her presence. Moreover, as I previously noted, Shumpert's conduct and language on the occasion of Navarro's lunchtime-work grievance does not give rise to an inference of discrimination. And while it may well have been uncomfortable, insulting, and humiliating for Navarro to be required, for a period of several weeks, to wait outside the office to sign in,[18] the EEOC

_____

[18]There is no basis in the record for concluding that this situation began prior to April 17, 2007 (the date Navarro cited in her IDHR charge), since Navarro testified in this case that she could not remember when it started, and her testimony that the period included "winter" does not preclude the possibility--at least here in Chicago--that it began sometime in April.

does not cite to any authority on which to base the conclusion that this experience was severe or pervasive enough, even considered in conjunction with Shumpert's offensive remarks, to have rendered her overall working environment objectively hostile.

Finally, Navarro's harassment claim is somewhat unique, in that Navarro herself admitted to an entirely nondiscriminatory basis for Shumpert's hostility toward her: Navarro testified that she had worked with Shumpert before coming to RJB, when both women worked at Chicago Public Schools, and at that time, Shumpert was "friendly" with her, told her that she "dress[ed] really nicely" and was "a good worker," and never discriminated against her. G. Navarro Dep., Def.'s L.R. 56.1 Stmt., Exh. 8 at 195:24-196:15 (DN 133-11). According to Navarro, Shumpert's attitude toward her changed after Navarro "told Figueroa and others in a meeting that Shumpert had only been a secretary at CPS, which Navarro believed was contrary to what Shumpert had put on her resume." Def.'s L.R. 56.1 Stmt. at ¶ 220 (DN 138).[19]

In sum, while Navarro's list of complaints is long and varied, I conclude that even viewed in the light most favorable to her, the record as a whole could not permit a reasonable jury to rule in the EEOC's favor on any of the claims it brings on her behalf. The

---

[19]Although Navarro's testimony on this point is somewhat unclear, the EEOC does not dispute defendants' factual statement quoted above. Pl.'s Resp. To Def.'s L.R. 56.1 Stmt. at ¶ 220 (DN 185).

EEOC's harassment claims fail either because its evidence does give rise to a reasonable inference that the conduct about which Navarro complains was based on her national origin; because the conduct itself did not, as a matter of law, rise to the level of actionable harassment; or because any conduct that arguably met that threshold was not severe or pervasive enough to create an objectively hostile or abusive work environment. Navarro's retaliation and retaliatory harassment claims fail because there is no reasonable basis from which to infer that the harassing conduct was the result of Navarro's protected activity.

## C. Elqui Navarro

The EEOC brings a harassment claim on behalf of Elqui Navarro and delineates its evidence into three general categories of complaints: extra work, disparate enforcement of work rules, and denial of overtime opportunities. As explained below, the EEOC's evidence in each of these categories is insufficient for substantially similar reasons to those addressed in the previous section.

The EEOC states that Navarro[20] was hired by RJB on January 2, 2001. Pl.'s L.R. 56.1 Stmt. ¶ 340 n. 5. Navarro complains that from May of 2006 through September of 2008, he would miss a portion of his lunch break every forty-five to sixty days (when there were special events at the building to which he was assigned during that

_____

[20]In this section, Navarro refers to Elqui Navarro.

period), to complete work that should have been handled by the preceding night's shift. Navarro testified that he complained to site managers Wesley and Bonk about the extra work, after which RJB assigned a temporary worker from 7:00 am to 11:00 to help Navarro. According to Navarro, that person (an African-American named "Sharon"), was a good worker, but after RJB moved Sharon to a permanent position, it replaced her with Dionne Daniel (also African-American), who Navarro thought was a poor worker and said so to Wesley, who said "nothing" in response. E. Navarro Dep., Def.'s L.R. 56.1 Stmt., Exh. 7 at 49:16-52:1, 56:3-59:5 (DN 133-10). Navarro testified that he does not know whether Wesley talked to Daniel about the issues Navarro raised. *Id*. at 60:21-24. This is the totality of the EEOC's evidence in support of the "extra work" portion of Navarro's claim.

I am at a loss as to how the foregoing evidence supports the inference that RJB intended to harass Navarro on the basis of his national origin, and the EEOC's citation to *Minor*, 457 F.3d at 634; *Haugerud v. Amery School District*, 259 F.3d 678 (7th Cir. 2001); and *Pace v. International Mill Service, Inc.*, No. 2:05 cv 69, 2007 WL 1035075 (N.D. Ind. Mar. 29, 2007), for the general proposition that "discriminatory work assignments can contribute to a hostile work environment" are no answer. As noted above, the *Minor* court acknowledged that "extra work" amounted to a material difference in the terms and conditions of the plaintiff's employment where the

excess was equivalent to a twenty-percent reduction in the plaintiff's salary. But the EEOC does not allege anything of the sort in Navarro's case. In *Haugerud*, among other salient distinctions, the employer explicitly directed male employees *not* to assist female employees who needed help. 259 F.3d at 686. Here, by Navarro's own admission, RJB assigned someone (an African-American, although it probably doesn't matter) to help him after he complained about too much work. And in *Pace*, the African-American plaintiff complained about the *type* of assignments he routinely received, which he claimed were less desirable than those given to white employees. Navarro's "extra work" complaint is not of this ilk. In short, nothing that can be derived from the EEOC's evidence suggests that Navarro's work assignments were motivated by a discriminatory animus.

In support of its claim that Navarro was subjected to more stringent application of work rules than African-American janitors, the EEOC cites evidence that Navarro observed Dionne Daniel, Lisa Hoskins, and Yolanda Pugh taking longer breaks than he believed they were entitled to, and, in Hoskins' case, leaving work before the end of her shift. Meanwhile, Navarro claims, Mark Bonk would monitor Navarro's lunch break to ensure that he took only the allotted time. Navarro also complains that a supervisor named Janice told him, "[c]an you do me a favor? Can you please take off your earring for tomorrow." Navarro testified that he complied

with this request, which Janice told him applied to everyone, and complained to Janice when he later saw several African-American employees wearing earrings.

Conspicuously absent from the EEOC's claim is any evidence that Navarro ever received a single reprimand, warning, or other form of discipline as part of the asserted unequal enforcement of work rules (or, for that matter, any evidence that his putative comparators were not disciplined). Indeed, Navarro testified that he always complied with his supervisors' requests. Similarly absent from the EEOC's allegations is that Navarro was ever subjected to, or even heard, any derogatory comments about Hispanics. His claim boils down to his perception that he was scrutinized more closely than certain of his African-American colleagues. But this claim finds no support in the only authority the EEOC cites, *Annis v. County of Westchester*, 136 F.3d 239, 248 (2d Cir. 1998), in which the plaintiff received a reprimand--which the court explicitly held was a "cognizable adverse employment action"--for conduct others outside the protected class did not. *Id.*

The final element of the EEOC's harassment claim on behalf of Navarro--that he was "denied" overtime opportunities in favor of African-American janitors--generally relies on the same type of evidence the EEOC asserts in support of his sister Gladys's claim, and it fails for the same reasons.

In sum, the EEOC's evidence does not raise a reasonable inference that Navarro was targeted for abuse on account of his national origin. Even if it did, the affronts Navarro describes are, in the context of his nearly nine years of employment with RJB, simply too "tepid or intermittent or equivocal" to give rise to an actionable harassment claim. *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998).

## D. Teodoro Medina

The EEOC alleges that Medina[21] was subjected to a hostile environment because RJB supervisors "overworked him compared to African-American janitors." The EEOC's support for this allegation is Medina's testimony that for a certain period of time, Medina was responsible, during his eight-hour night shift, for cleaning both Farr Hall and part of the Main Building, even though cleaning Farr Hall was itself an eight-hour job. Meanwhile, Medina testified, three African-American janitors were assigned to clean the E-1 building, although there was only "a little bit more" work at E-1, and that two African-American janitors were assigned to the Vandercook building, which likewise required "a little more" work than Farr Hall. In addition, Thomas Jones, Medina's first supervisor while he worked at both Farr Hall and Main, would sometimes ask Medina to work in other buildings to cover for a janitor who was absent. Medina's second supervisor, Jeff Bass,

---

[21]In this section, "Medina" refers to Teodoro Medina.

also sent him to work in other buildings, typically for about a half an hour three times a month, or less in the winter. Medina stated that he never saw Bass ask African-American janitors to work in different buildings.

The EEOC also claims that RJB harassed Medina based on his national origin by failing to post permanent positions that he would have applied for if he had known about them.

The EEOC's evidence falls short on several fronts. To begin with, as I noted previously, federal courts do not sit as a "super-personnel department," and routine decisions about matters such as work distribution among employees are generally outside the scope of our review, unless there is a reasonable basis for inferring that they violate Title VII. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006). Medina's subjective belief that he had more work than African-American janitors assigned to E-1 and Vandercook, without more, is insufficient to raise a reasonable inference that RJB singled him out, based on his national origin, for hostile or abusive treatment.[22] *See Peters v. Renaissance Hotel*

_____

[22]This is particularly so in view of defendants' evidence, submitted in support of their reply, that compares the size of the respective buildings, and on its face suggests that E-1, which measures 130,466 square feet, is over eight times the size of Farr Hall, which measures roughly 16,800 square feet. *See* Def.'s Reply to Pl.'s L.R. 56.1 Stmt. ¶ 293, Exh. 92. While the EEOC moved to file a sur-reply in response to defendants' reply, and was granted leave to do so, it did not address this evidence, which cries out for "hard evidence" to support Medina's subjective belief that his workload in Farr (and a portion of the 51,000 square foot Main) was nevertheless heavier than that of his two colleagues in E-1, and

*Operating Co.*, 307 F.3d 535, 549 n. 11 (7th Cir. 2002). The EEOC's string citation to *Haugerud*, 259 F.3d 678; *Pace*, 2007 WL 1035075 at *6; and *Minor*, 457 F.3d at 634 offers nothing to the contrary.

Moreover, the EEOC does not assert that Medina was required to perform tasks outside the scope of his duties, or that he was required to work longer than his eight-hour shift. The EEOC also makes no claim that anyone at RJB used derogatory or offensive language about Hispanics in Medina's presence.

Although Medina explained that he had to "hurry" to complete his regular work on the occasions where Jones asked him to cover for absent janitors in other buildings, and would sometimes work through his breaks (although no one told him he had to), Medina testified that on those occasions, "[Jones] would ask me, do you want to go to the other building. I would tell him, yes. ... I felt content because he was recognizing the job that I did." T. Medina Dep., Def.'s L.R. 56.1 Stmt., Exh. 6 at 59:19-60:3 (DN 133-9). Medina further explained that he felt "appreciated, because [Jones] would tell me that I was a fantastic worker. And that really meant a lot to me." *Id*. at 58:14-18. Indeed, Medina

that it was motivated by an intent to harass him based on his national origin. *Pilditch v. Board of Educ. of City of Chicago*, 3 F.3d 1113, 1119 (7th Cir. 1993)(plaintiff's subjective beliefs, "without the backing of hard evidence," cannot prove discriminatory animus); *see also Matsushita Elec*. *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (where the record as a whole renders the non-movant's claim "implausible," it "must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary.").

testified that Jones recognized Medina as employee of the month and awarded him a plaque. *Id*. at 60:12-14. These are not the hallmarks of a hostile working environment.

The EEOC's remaining evidence is equally equivocal. Medina's testimony that he was interested in six unposted positions, when he has not shown that he was qualified for any of them, and has no idea who was ultimately awarded three of them, not only fails to support his failure-to-promote claim for reasons explained in a previous section, it also falls short of suggesting the kind of severe or pervasive, objectively hostile conduct necessary for an actionable harassment claim.

## E. Maria Obregon

Maria Obregon was hired as a call-in janitor in October of 2006. She became a permanent part-time employee in March of 2007, whereupon she was assigned to work weekend nights in the MTCC Building. In November of 2007, she bid for, and was awarded, a full-time position working in Wishnick Hall, where she remained until September 3, 2008. The EEOC claims that Obregon was subjected to a hostile environment based on the following allegations: 1) that Obregon was not awarded call-in opportunities that were instead given to African-American call-in employees; 2) that on one occasion, Obregon was called in for work but then sent home without pay; 3) that Obregon was required to do more work than African-American janitors, causing her to work through her lunch

break without pay; 4) that Obregon's requests for help were denied, while those of her African-American co-workers were granted; 5) that Obregon was unfairly disciplined; and 6) that a job Obregon bid for while she was a permanent employee was awarded to an African-American call in. The EEOC does not claim that Obregon ever heard anyone at RJB use derogatory language to describe a Hispanic employee. Indeed, Obregon testified that she did not. Obregon Dep., Def.'s L.R. 56.1 Stmt, Exh. 9 at 106:1-10; 136:23-137:6 (DN 133-12).

Many of the EEOC's allegations are similar to those discussed in previous sections, and its evidence with respect to those fails to support its harassment claim for reasons already explained. For example, Obregon's perception that her workload in the Wishnick building was heavier than that of Curtis Brown, the African-American janitor who preceded her in that position, and that certain African-American janitors received help with their assignments more often than she, does not reasonably give rise to the inference that Obregon's own work assignment was motivated by RJB's intent to harass her because she is Hispanic. It is undisputed, for example, that Obregon affirmatively sought out the position in Wishnick (which the EEOC acknowledges was a promotion for her, since she became eligible for union membership and other benefits as a permanent employee), and even to the extent she claims she relied on Leticia Archibald's assurances that she would

receive "help" in that position, Obregon testified that she did, in fact, receive help at least some of the time. That Obregon perceived Brown (who she acknowledged generally worked alone in the building) as receiving help on more occasions than she simply does not amount to meaningful evidence that RJB meant to harass Obregon based on her national origin, particularly since Obregon herself offered an alternative explanation for why call-ins were sent to help Brown: during his tenure, Wishnick was "in construction. They had to take things out, trash." Obregon Dep., Def.'s L.R. 56.1 Stmt., Exh. 9 at 80:22-81:5.

As for Obregon's testimony that African-American janitor Rosita Johnson was not required, as Obregon was, to shovel snow in front of her assigned building, I agree with defendants that Obregon lacks personal knowledge about who, if anyone, shoveled snow in front of Johnson's building, and that Obregon's belief that Johnson was not required to do so is based on what a coworker told her. *Id.* at 95:8-96:10. Even if this testimony were admissible, it does not support an inference that Bass--who the EEOC states believed Obregon was a good worker--made Obregon shovel snow in order to harass her because she is Hispanic. The EEOC's remaining evidence of a putatively unfair workload or refusals of help provides similarly insufficient grounds for inferring national-origin based harassment.

The EEOC's argument that Obregon was disciplined unfairly is based on evidence that Jeff Bass gave Obregon a "warning" for failing to shovel snow in front of her building on one occasion, in February of 2008.  Obregon acknowledged that a meeting was held at which all janitors were told they had to shovel snow in front of their buildings, and she does not dispute that she failed to do so on the day in question.  There is no dispute that this warning did not affect the material terms or conditions of Obregon's employment, or that it was the only warning Bass ever gave Obregon. In this context, the EEOC's evidence that Bass was a "lenient disciplinarian" overall, or that he declined, on the specific occasions the EEOC identifies, to discipline certain African-American janitors as strictly as he could have for various infractions (none having to do with snow removal) does not reasonably give rise to the inference that Bass issued Obregon the warning for discriminatory reasons.

The EEOC also asserts that RJB harassed Obregon while she was a call-in employee by making her wait, before assigning her a shift, while Leticia Archibald first called African-American call-in employees to see whether they wanted to work.  Among the various problems with the EEOC's evidence on this issue, not all of which merit discussion, Obregon testified that this occurred on only three or four occasions.  Obregon further testified that on only two or three occasions, throughout Obregon's entire eight month

tenure as a call-in, did Archibald tell her not to come in to work, explaining to Obregon that "it was full," which Obregon took to mean that "nobody had been absent and nobody was going to be absent." Even assuming that Archibald had a discriminatory preference for calling African-American call-in janitors before calling Obregon, there is simply no reasonable basis in the EEOC's evidence for concluding that Archibald's conduct on the occasions cited amounted to the kind of severe or pervasive harassment that a reasonable person would find objectively hostile or abusive.

The same is true with respect to the incident the EEOC cites in which Obregon (still a call-in) arrived at work for a night shift on the assumption that there would be work available for her (but without having spoken to Archibald or anyone else at RJB to confirm whether there was), but was sent home by Angela Shumpert, who told her loudly, and in front of her coworkers, that she was "useless to [her]" and "no good." The EEOC does not assert that Shumpert made any explicitly anti-Hispanic comments on this occasion, but even assuming that her treatment of Obregon was motivated by a discriminatory bias, this isolated incident, even in conjunction with the preceding one (in which Archibald made Obregon wait to receive an assignment), does not rise to the level of an actionable claim.[23]

---

[23]In the same factual statement in which it recounts this incident, the EEOC claims that a few weeks earlier, RJB "fired" Obregon then "called her back" the next day. The EEOC does not

The EEOC's last piece of evidence to support Obregon's harassment claim is Obregon's testimony that an African-American call-in janitor, Amelia Stevens, was awarded a position for which Obregon, who was then a permanent employee, had also bid. The EEOC states that Obregon filed a grievance with the union over this matter but omits that the union concluded that RJB had not violated the CBA since it first awarded the position to Hispanic janitor Alberto Garcia "per seniority," and only later gave the position (which was then a "secondary" position that need not have been posted pursuant to the MOU between RJB and the union) to Stevens, who had been a call-in employee since before Obregon began working at RJB. Def.'s L.R. 56.1 Stmt., Exhs. 9-C; 58. Obregon disagreed with the union's conclusion (as does the EEOC, apparently), but neither offers an alternative interpretation of RJB's obligations under the CBA and MOU nor identifies affirmative evidence to suggest that RJB's procedure was improper, much less that it was motivated by an intent to harass Obregon because she is Hispanic.

### F. Rosa Del Toro

Rosa Del Toro was hired as a call-in janitor in March of 2006, and apparently remained employed by RJB until September 30, 2008, although she claims to have been called in "less frequently" after February of 2007. The EEOC devotes only a page of its brief to Del

explain, however, how this fleeting termination, if indeed there was one, relates to the other incident, or how it supports Obregon's harassment claim.

Toro's harassment claim, and I may dispose of it nearly as succinctly. The following summarizes the basis for her claim:

On two occasions, Del Toro's supervisor, Cathola Smith, made offensive, racially charged remarks.[24] First, on Del Toro's first day of work, Smith asked Del Toro why Hispanics did not learn English and referred to them as "donkeys" (or, possibly, as "dumb asses"--Del Toro's testimony is inconsistent). Del Toro Dep., Def.'s L.R. 56.1 Stmt., Exh 3 at 18-144:2; 44:8-14. About three months later, Del Toro observed Smith confront another Hispanic janitor about being late, which prompted a heated exchange during which Smith said to the other janitor, "[w]hy are you always doing this to me? Fucking Mexicans... I'm fed up. I'm fed up with all of you. Shut up...Dumb ass Mexicans." *Id*. at 90:3-13. Smith then turned to Del Toro and said, "you fucking Mexican, go to work." *Id*. at 90:18. On a third occasion, Del Toro heard an RJB supervisor from another shift say to other janitors, "[h]ey you fucking Mexicans. There's the keys. There's your God damn keys." *Id*. at 112:6-7.

The EEOC next cites an episode in which Smith assigned Del Toro, another Hispanic janitor, and three African-American janitors

---

[24]I am mindful that "race" and "national origin" are separate categories protected under Title VII, and that it is national origin that is at issue in this case. But because I can think of no non-awkward equivalent to the commonly used phrase "racially charged" to convey a derogatory remark that focuses on national origin, I sometimes use that phrase throughout this opinion when describing remarks that focus on an individual's Hispanic origin.

to clean up carpentry debris in a classroom.  According to Del Toro, the three African-Americans sat down and drank soda instead of working, leaving Del Toro and her Hispanic colleague to complete the task alone.  When Del Toro later complained to Smith, Smith merely responded, "oh, they're just crazy." *Id.* at 83:6-11.

Next, the EEOC states that on April 20, 2006, Smith sent Del Toro to fill in for another janitor, but Del Toro was not paid for her work on that day, despite complaining three times to Smith, who said each time that she would receive payment in the next check. And on another date the EEOC does not identify, Del Toro and her sister Martha Lopez worked four hours of overtime, but they were paid only at the regular rate, despite multiple complaints to Leticia Archibald.

The EEOC concludes its argument in support of Del Toro's claim with citations to four cases: *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 950-51 (7th Cir. 2005); *Haugerud v. Amery School Dist.*, 259 F.3d 678 (7th Cir. 2001); *Pace v. Int'l. Mill Service, Inc.*, No. 2:05 cv 69, 2007 WL 1035075 (N.D. Ind. Mar. 29, 2007) ; and *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006). None of these cases supports the conclusion that the EEOC may proceed to trial on Del Toro's harassment claim.

While the *Cerros* court indeed held that distinctly racial epithets fall on the "more severe end" of the spectrum, it also acknowledged that the "mere utterance of an epithet which engenders

offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII," 398 F.3d at 951. Thus, the case does not stand for the proposition that any exposure to offensive, racially charged remarks, however isolated or infrequent, gives rise to an actionable claim. What led the court to reverse summary judgment for the employer and remand the case for further proceedings in *Cerros* was the apparent inconsistency between the district court's finding, on the one hand, that the employer had engaged in an "appalling litany of misconduct," including the repeated use of a range of offensive epithets, and its conclusion, on the other, that the harassment was "relatively isolated" and "neither frequent, nor severe." Here, by contrast, while the remarks Del Toro attributed to Smith and to the unidentified supervisor were demeaning and obnoxious, they were, in the context of Del Toro's several years of employment, during which she heard no other racially offensive language from any RJB supervisors, too isolated to give rise to an actionable claim. *See Filipovic v. K&R Exp. Systems, Inc.*, 176 F.3d 390 (7th Cir. 1999) (four national origin-related comments over the course of more than a year not actionable).

None of the remaining incidents factually compares to those at issue in *Haugerud*, *Pace*, or *Minor*, and none supports the inference that RJB intentionally harassed Del Toro on the basis of her national origin. Indeed, the various episodes Del Toro testified

about reflect the kind of "normal workplace friction" that is not actionable under Title VII. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (complaints about transfers, a late overtime payment, salary, and difficulties with managers not actionable harassment).

## G. <u>Maria Rosales</u>

The EEOC claims that Maria Rosales, a call-in janitor who began working for RJB in 2003, was terminated in August of 2006 on the basis of her national origin. It is undisputed that Rosales did not work for RJB any time after August of 2006, but the parties offer vastly different explanations for why that is the case. According to the EEOC, after Rosales complained to the union that she had been passed over for a position to which she believed she was entitled, Angela Shumpert was "infuriated" and told Tony Wesley to "fire her fucking ass. Never put her back on the schedule." Wesley Dep., Def.'s L.R. 56.1 Stmt., Exh. 76 at 275:16-18 (DN 137-4). Wesley testified that Shumpert continued, "any Hispanic or Mexican that goes to the union or says anything, fire them.... They should go back to their fucking country." *Id*. at 275:19-22. According to Wesley, Leticia Archibald, who the parties agree was responsible for calling call-in employees to work, was present when

Shumpert made these comments. Wesley Decl., Pl.'s L.R. 56.1 Stmt., Exh. 20 at ¶ 8 (DN 153-1).[25]

It is undisputed that in September of 2006 (after previously informing the union that she could not work nights because of medication she was taking), Rosales told the union that she was available for work on any shift and provided a telephone number where RJB could reach her. The EEOC asserts that RJB never called Rosales at the number she provided, pointing to telephone records that reflect all incoming calls to that number for the relevant time. The EEOC further claims that Rosales continued to call RJB throughout the end of 2006 and early 2007; that each time she was told there was no work for her; and that RJB would call her if she was needed. Rosales claims that on one occasion, the person she spoke to told her not to call back anymore, and that RJB was not going to give her work. As additional evidence that Rosales's termination was discriminatory, the EEOC points to inconsistent statements by RJB about the reasons Rosales stopped working after August of 2006.

Defendants insist that RJB never terminated Rosales and did attempt to call her using the number she provided, but that the

---

[25]Defendants deny that Archibald was present for this conversation and suggest that Wesley's statement to the contrary in his declaration should be disregarded because it "contradicts his own [deposition] testimony." But Wesley was not asked at his deposition whether anyone else was present for the conversation, and I find no inconsistency between his testimony and his declaration.

number was not working. Defendants cite the testimony of Leticia Archibald, who, it appears from her testimony, was asked to interpret contemporaneous notes she made on documents titled "Employee Phone List" (although these documents do not seem to have been made part of the record). This is the same position RJB took in its November 20, 2006, response to a discrimination charge Rosales filed before the IDHR. The response states that RJB "called Rosales for an assignment but her number was not in service"; that it had no other way to contact Rosales; and that Rosales did not contact RJB either to provide a working phone number or to inquire about assignment. Pl.'s L.R. 56.1 Stmt., Exh. 68 at E002955 (DN 153-7). But an email dated October 16, 2006, from Angela Shumpert to Karen Cash states with respect to Rosales, "[w]e didn't use her any longer due to performance and other issues." Pl.'s L.R. 56.1 Stmt., Exh. 72 (DN 153-7). I agree with the EEOC that Shumpert's email can be construed as inconsistent with RJB's IDHR response and current position, and that a reasonable fact finder could infer a pretext for discrimination on this basis.

Defendants further assert (as they did in their 2006 IDHR response) that RJB called other Hispanic janitors for work during the relevant period and argue that this defeats any inference that a discriminatory animus motivated Rosales's lack of work. But the fact that RJB called other Hispanic janitors is irrelevant to

Rosales's claim. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587-88 (7th Cir. 2011) ("Title VII would have little force if an employer could defeat a claim of discrimination by treating a single member of the protected class in accordance with the law. ... Discrimination against one Hispanic employee violates the statute, no matter how well another Hispanic employee is treated.")

Defendants also argue that the statements attributed to Shumpert reflect hostility to Rosales not on the basis of her national origin, but instead on the basis that she complained to the union. But even if that is true, a fact finder could still infer discrimination in view of the testimony of Ella Patterson that while Shumpert directed project managers to terminate Hispanic janitors who "complained a lot to the union" (and that, indeed, at least one Hispanic janitor--Maria Rodriguez, whose claim is discussed immediately below--was fired on that basis), she gave no similar directive with respect to African-American janitors who did the same. *See* Patterson Dep., EEOC Supp. Exh. at 93:13-94:7; 159:20-160:20 (DN 182-1).

Defendants raise additional arguments and evidence to support their position that Rosales was not terminated at all, and that she ceased working for non-discriminatory reasons, but I need not address these because I conclude that the EEOC has identified sufficient direct and circumstantial evidence, under the direct method, to enable a reasonable juror to infer that Rosales was

terminated, and that her termination was based on her national origin. Accordingly, the EEOC is entitled to a trial on this claim. *See Diaz*, 653 F.3d at 588. ("Under the direct method of proof, the plaintiffs are not required to rebut a defendant's non-discriminatory reason for the adverse employment action, as they must under the indirect method.")

## H. <u>Maria Rodriguez</u>

The EEOC likewise may proceed on its discriminatory termination claim on behalf of Maria Rodriguez. Ella Patterson testified that she hired Maria Rodriguez as a permanent employee in 2007, and that Rodriguez "was working out really well." Patterson Dep., EEOC Supp. Exh. at 156:12-14 (DN 182-1). Nevertheless, Patterson testified, Shumpert told her to fire Rodriguez after learning that Rodriguez had complained to the union about a wage issue. *Id*. at 103:2-10; 156:10-23. In addition, the EEOC cites evidence that RJB provided inconsistent accounts of why Rodriguez was terminated and other circumstantial evidence of discrimination.

Although defendants dispute that Rodriguez was a permanent employee at the time she stopped working for RJB, they do not appear to dispute that Rodriguez was indeed terminated. Their sole argument for summary judgment is that the record reflects that Rodriguez was terminated because she complained to the union, not because she was Hispanic. As explained in the preceding section,

however, Patterson testified that Shumpert directed project managers to fire Hispanic janitors who complained to the union, but did not issue a similar directive with respect to African-American janitors who did the same. Accordingly, a jury could reasonably infer that Rodriguez's termination--even assuming that it was, indeed, prompted by her union complaints--was discriminatory.

## I. Martha Lopez

Martha Lopez began working for RJB at the start of its contract with IIT, where Lopez had been employed with RJB's predecessor. Lopez was a union steward from approximately late 2002 until late 2005. She continued to work for RJB until she suffered a work-related injury in 2008. She remained on disability leave until at least the time of her deposition in this case, on May 31, 2011. The EEOC brings a claim of harassment on her behalf, which I conclude raises sufficient material factual disputes to proceed to trial.

There is no need to examine in detail each incident on which the EEOC relies in support of its argument that Lopez was harassed on the basis of her national origin. Broadly speaking, many of Lopez's complaints fall into the same categories as other claimants': excess work and discriminatory work assignments; being required to work through breaks without pay; the denial of a transfer request and requests for overtime. Unlike the harassment claims of the individuals discussed in previous sections, however,

which, as a matter of law, cannot, for the reasons explained, proceed to trial based on the EEOC's cited evidence, Lopez's claim is backed by sufficient evidence to enable a jury to conclude, under *Haugerud v. Amery School Dist.*, 259 F.3d 678, 693 (7th Cir. 2001), that she was harassed; that the harassment was based on her national origin; and that the conduct was severe or pervasive enough to create an environment that was both subjectively and objectively hostile.

For example, in addition to Lopez's testimony that she was required to work more than her African-American coworker Rosita Johnson (who worked in Lopez's own building, and whose work and working conditions she could routinely observe, unlike in Gladys Navarro's case above), Lopez testified that when she complained about having too much work, three supervisors (Wesley, Bass and Holliday) all told her that Angela Shumpert had told them to deny her requests. Lopez further testified that on one occasion, after she asked Wesley for help, Wesley responded that "he was very sorry, but that he could not send me help because Angela had forbidden him from doing so," and that Shumpert had further told Wesley, "on the contrary, to give me more and more work until I decided to leave on my own. I asked him why...[a]nd he said that –– he answered that he was very sorry but that what Angela wanted was to have no Hispanics working on campus." Lopez Dep., Def.'s L.R. 56.2 Stmt., Exh. 5 at 329:14-330:4. This is consistent with

Wesley's own testimony that he told Shumpert that Lopez had "way too much" work, and that Shumpert's response was that they should "progressively fire" Alberto Garcia, who shared the second shift in the Main building with Lopez from approximately December of 2005 until March of 2007, and who filed a grievance claiming his workload there was excessive. Wesley Dep., Def.'s L.R. 56.1 Stmt., Exh. 76 at 40:7-42:12 (DN 137-4). A jury could reasonably infer from this evidence, particularly in view of other evidence discussed below, that Lopez's excessive workload reflected Angela Shumpert's intent to force Lopez out of RJB because of her national origin.[26]

Defendants do not dispute the EEOC's statement that Lopez bid for a transfer to another building but was passed over, purportedly on the ground that the desired position was a "man's job," only to discover that Rosita Johnson, an African-American woman with less seniority than Lopez (and who had been working with Lopez in the evidently labor-intensive Main building), was awarded the job

_____

[26]That Lopez was offered a promotion to supervisor does not necessarily refute the inference that Shumpert sought to fire or otherwise "get rid of" Lopez based on her national origin. The EEOC's theory, based on Lopez's declaration, is that Shumpert offered Lopez the position so that Lopez would lose the union protections to which she was entitled as a janitor and could then fire her. Indeed, Lopez stated in her declaration that the reason she rejected the offer was that she "underst[oo]d the double intentions of Shumpert because if I become a supervisor, I will no longer be a member of the union and Shumpert can easily find a way to fire me." Lopez Decl., Pl.'s L.R. 56.1 Stmt., Exh 7 at 29 (DN 153-1).

instead. This evidence could reasonably be construed to suggest that when Lopez sought an escape from her excessive workload in Main, RJB wrongfully denied her a transfer in order to continue harassing her with too much work. Indeed, Lopez remained in her position in Main, apparently without relief from her excessive workload, until she was injured and stopped working in 2008.

In addition to the foregoing evidence, Ella Patterson testified she heard Shumpert tell Leticia Archibald that she "wanted [Lopez] gone," and suggested that Archibald "get rid of her" by planting drugs in her purse. Patterson Dep., EEOC Supp. Exh. at 98:2-10 (DN 182-1). Indeed, Lopez herself stated that Patterson told her to be careful about what she did with her purse and her personal belongings, "because Angela had told them that she was going to put drugs in my purse. And I said, what's really going on? Why is she acting that way? And she said because she doesn't want Hispanics. She wants them to leave." Lopez Dep., Def.'s L.R. 56.1 Stmt., Exh. 5 at 335:14-24 (DN 133-8). Defendants' argument that no drugs were ever planted on Lopez is irrelevant. A jury reasonably could construe as objectively hostile the very fact that Lopez's supervisor told Lopez that the general manager was scheming to fire her based on her national origin, regardless of whether that scheme ultimately came to fruition.

This scenario, unlike the ones described by the claimants discussed above, is indeed reminiscent of *Haugerud*, in which the court considered evidence that the plaintiff's coworkers and supervisors were deliberately undermining her ability to perform her work. For example, the court noted that the individual responsible for establishing the plaintiff's work schedule intentionally gave her a schedule that there was "no way in hell" she could handle, hoping to show that "no woman" could do the job. 259 F.3d at 686. In the *Haugerud* court's view, this statement-- along with evidence that the plaintiff had been given assignments outside of her normal duties, that her requests for her assistance were routinely denied (while those of her male colleagues were not), and that various individuals at the employer appeared to be plotting to force plaintiff out of her position--supported her claim of a hostile environment.

The above is not an exhaustive discussion of the evidence the EEOC cites in support of Lopez's claim (and I express no opinion on whether its remaining evidence supports her claim as a matter of law), but it is sufficient to enable a reasonable jury to conclude that Lopez was harassed, that she was harassed because of her national origin, and that the conduct was severe or pervasive enough to create a subjectively and objectively hostile environment. *See Haugerud*, 259 F.3d at 693.

J. Alberto Garcia

The EEOC's harassment claim on behalf of Alberto Garcia, by contrast, suffers from the same flaws as those discussed in sections B through F, above. Like Lopez, Garcia worked for RJB throughout its nearly eight year contract with IIT. The asserted bases for Garcia's harassment claim are: 1) that on one occasion, claimant Tony Wesley said "I don't want fucking Hispanic ass here"; 2) that on one occasion, supervisor Thomas Jones required Garcia to sign out at the end of his shift but then return to his building to complete unfinished work, threatening to terminate him if he did not do so; 3) that Jones yelled and laughed at Garcia, but not at African-American janitors; 4) that in August of 2007, supervisor Cathola Smith allowed three non-Hispanic janitors to leave for their lunch break thirty minutes early, but when Garcia left five minutes early for his break, he received a reprimand; and 5) in approximately June of 2006, an African-American janitor who had never worked at RJB was awarded an unposted position that Garcia would have bid on had it been posted.

The first incident is delicate for the EEOC, since Wesley is himself a claimant in this case who testified that he "never" used disparaging language towards, or otherwise discriminated against, Hispanics. But even assuming that Wesley made the statement Garcia attributes to him, Garcia's exposure to one ethnic slur (that Garcia testified he "didn't take [] personally") over his roughly eight year tenure at RJB epitomizes the kind of isolated incident

that amounts to little in an assessment of an employee's overall working environment. *Vance v. Ball State University*, 646 F.3d 461, 472 (7th Cir. 2011) ("We have said that Title VII is 'not ... a general civility code' and we will not find liability based on the 'sporadic use of abusive language.'") (quotation marks citations omitted).

As for the EEOC's second allegation—that Garcia was forced to sign out but continue working for no additional pay—when asked at his deposition about the allegation, "Jones told Garcia that he should sign out after he worked eight hours but then return to his building and complete his assigned duties for no additional pay," Garcia testified that Jones had said that to Garcia *and* Mike Holliday (African-American) on four or five occasions. While a jury might well conclude that requiring Garcia (and Holliday) to work overtime for free was unfair, it could not reasonably find, on this evidence, that Jones's intent was to harass Garcia based on his national origin. And although there is some evidence, discussed in conjunction with Martha Lopez's claim above, that Angela Shumpert wanted to fire Garcia for complaining to the union about his workload, Garcia was not fired, and there is no evidence in Garcia's case (as there was in Lopez's) either that Shumpert influenced the amount of work Garcia was assigned, or that his workload was the product of anyone's animus toward Hispanic workers.

With respect to the EEOC's third allegation, Garcia's statement in his declaration, "When Thomas Jones was my supervisor, he used to yell at me and laugh.  I never heard him yell at African American janitors" is so lacking in context or factual detail that it cannot reasonably be construed to support the inference that Jones subjected Garcia, because he is Hispanic, to materially worse treatment than his African-American coworkers.

Finally, evidence that Cathola Smith reprimanded Garcia on one occasion, without material consequences, for conduct he believes Smith tolerated when three African-American coworkers committed similar violations, even if true, is insufficient to support the EEOC's claim that Garcia was subjected to severe or pervasive national origin-based harassment.  Indeed, Garcia testified elsewhere that Smith sometimes treated him "in a very nice way," and that he "never thought [Smith] was giving [him] a racist kind of treatment."  Garcia Dep., Def.'s L.R. 56.1 Stmt., Exh. 4 at 41:6; 153:10-11.

"When evaluating a hostile work environment claim, we consider 'the entire context of the workplace,' see *Cerros I*, 288 F.3d at 1046, not the discrete acts of individual employees." *Vance,* 646 F.3d at 470-71 (7th Cir. 2011).  The EEOC does not cite a single case for its conclusory statement that "[v]iewed cumulatively, a jury could easily find that [the alleged] conduct constitutes harassment based on national origin."  Indeed, for reasons

explained throughout this opinion, the EEOC's evidence does not--especially in the context of Garcia's lengthy and predominantly uneventful employment at RJB--reasonably give rise to such a conclusion.

## K. <u>Guillermina "Gina" Avila</u>

Gina Avila worked for RJB throughout RJB's contract with IIT. From 2002-2008, her supervisor was Cathola Smith. From 2008-2010, Taryn Dyson supervised her. Leticia Archibald and Michael Holliday also supervised her for a short period at some point. All of Smith, Holliday, and Dyson testified that Avila was a good worker.

The EEOC asserts a hostile environment claim on Avila's behalf, the focus of which the manner in which she was treated by Dyson. The EEOC points to evidence that Dyson (like Smith before her) required Avila to do work that should have been done by her African-American coworkers, especially Anthony Woods; that Dyson yelled and screamed at Avila; and that Dyson gave Avila two written warnings. The EEOC claims that Smith, too, required Avila to do work that should have been done by Woods (or, on about ten occasions, by an African-American janitor on another shift, Donna Render), but does not otherwise assert that Smith mistreated Avila in a hostile or abusive manner. Indeed, Avila acknowledged that Smith made no disparaging remarks about her or her ethnic background and treated her "respectfully." Avila Dep., Def.'s L.R. 56.1 Stmt., Exh. 1 at 38:1-14 (DN 133-1).

The evidence reveals that the first two items (requiring Avila to help others with their work and yelling at her) are related. Avila testified that when Smith required Avila to help Anthony Woods with work that was on his schedule, Avila would "argue very strongly with her because [Woods] spent his time sleeping." *Id.* at 20:19-23. Although Avila does not claim that Smith yelled at her, she testified that Smith told Avila that she had to help Woods anyway and did not take any action against Woods for sleeping. *Id.* at 25:11-21. Avila continued to complain about having to help Woods after Dyson replaced Smith as Avila's supervisor in 2008. Dyson, however, responded more harshly than Smith to Avila's complaints about having to help other janitors with their own work, telling Avila to "be quiet" or "shut up" and saying that it was "[her] responsibility, [her] obligation" to do the work. *Id.* at 75:7-13; 69:19-23. Avila further explained the circumstances in which Dyson yelled at her as follows: "Whenever she would go looking for me and I had not finished what she had asked me to do, I would want to explain to her why the work had not been finished. She wouldn't listen to me. She would tell me to shut up." *Id.*, at 76:5-9.

The EEOC relies heavily on the testimony of Brenda Stewart, an IIT employee, who testified that Dyson spoke to Avila in a "rude, abusive, vicious" and "venomous" manner that she did not see Dyson use with African-American employees. Stewart Dep., Pl.'s L.R. 56.1

Stmt., Exh. 29 at 177:7-178:9 (DN 153-3). Stewart personally witnessed Dyson yelling at Avila on three occasions. *Id.* at 154:6-7. Stewart also testified that she saw Dyson verbally abuse another Hispanic janitor named Jose, and that five other Hispanic janitors had complained to her about the way in which Dyson spoke to them. Stewart Dep., Pl.'s L.R. 56.1 Stmt., Exh. 29 at 123-126. Stewart had also heard Dyson yell at an African-American employee named J.B., but according to Stewart, Dyson's tone was "not to th[e] level" she used with Avila (which she characterized as a "12" on a scale of one to ten). Stewart heard Dyson yelling on the phone "almost every day," and "assume[d]" based on context that Avila was usually at the other end of the line. *Id.* at 154:4-15. Stewart acknowledged, however, that on some of these occasions, she believed someone other than Avila was on the receiving end of Dyson's yelling, including Mark Bonk, who is white. *Id.* at 154:4-158:8.

Stewart does not recall hearing Dyson use racially charged epithets, however, and, indeed, Avila acknowledged that Dyson did not make any derogatory remarks about her Mexican heritage or her national origin. Avila Dep., Def.'s L.R. 56.1 Stmt., Exh. 1 at 120:23-121:3 (DN 133-1). Avila explained that Dyson "wouldn't use bad words, but she would say, where were you? I was looking for you?" *Id.* at 120:16-18.

With respect to the two reprimands Avila received from Dyson, Avila acknowledged that she had engaged in the conduct for which she received the warnings (in one instance talking to the customer about RJB business, and in the other taking an unauthorized coffee break). The EEOC argues, however, that African-American janitors engaged in "more egregious" offenses than Avila's but were not appropriately disciplined, and that Avila's second offense should not have resulted in a written warning according to Dyson's own description of her disciplinary practices.

Taken together, this evidence could lead a reasonable jury to conclude that Smith and Dyson unfairly required Avila to pick up the slack of less highly performing janitors, and that Dyson yelled at Avila when she complained about having to do so, or when Avila could not be located. A jury might further conclude that Dyson's overall treatment of Avila was generally unfair, excessive, and even abusive. Where the EEOC's claim falls short, however, is in its dearth of evidence to suggest that Avila's treatment by either of her supervisors was visited upon her *because of* her national origin. No one, including both Avila and Stewart, ever heard Dyson direct a racially charged remark to Avila or to any Hispanic employee.[27] And although Stewart opined that Dyson treated Avila

---

[27]Stewart did testify that "very early on" Dyson made an "ethnically related" comment that Stewart found "unacceptable." Stewart Dep., Pl.'s L.R. 56.1 Stmt., Exh. 29 at 156:21-157:4. But whatever this comment was—Stewart could not recall—it does not appear to have been directed at anyone in particular. Moreover,

especially harshly, her testimony reveals that Dyson yelled at, or spoke disrespectfully to, Hispanics, African-Americans, and Caucasians alike. The EEOC's evidence may reveal that Dyson--who was apparently unpleasant to work with in general--picked on Avila in particular, but even so, that is not enough to bring Avila's claim within the ambit of Title VII. *See Vance v. Ball State University*, 646 F.3d 461, 470 (7th Cir. 2011).

In *Vance*, the court noted that "in her deposition Vance conceded that she never heard [her supervisor] say anything suggesting ill will towards her because of her race, nor did any other employee report to Vance that [her supervisor] had uttered racially derogatory comments." The court concluded that the supervisor's conduct--which included "aggressively approaching" the plaintiff while yelling at her--did not support a Title VII violation, reasoning as follows: "Although there is some indication in the record that [the plaintiff's supervisor] was generally difficult to work with, we assume, favorably to Vance, that he picked on her. Still, even in that light, Vance's allegations do not establish that [her supervisor]'s unkind or aggressive conduct was motivated by Vance's race. Although a plaintiff does not need to identify an explicitly racial dimension of the challenged conduct to sustain a Title VII claim, she must be able to attribute

---

Stewart acknowledged that after she told Dyson not to make comments like that, Dyson said "oh, okay," and never again referred to someone's ethnicity in Stewart's presence. *Id.* at 158:23-159:8.

a racial 'character or purpose' to it.") (citation omitted).
Because the EEOC's evidence fails to do so, it does not support
Avila's Title VII claim. *See Spearman v. Ford Motor Co.*, 231 F.3d
1080, 1085 (7th Cir. 2000) (vulgar language and insults used in the
context of "altercations with co-workers over work issues" did not
arise because of plaintiff's membership in protected group).

## L. <u>Jessica Vazquez</u>

Jessica Vazquez was hired by RJB as a call-in janitor in
January of 2006. As a call-in, she regularly worked a forty-hour
week on the night shift. After her first three days, she did not
call in ahead of time to see whether work was available. Instead,
she simply showed up, and supervisor Thomas Jones would give her
that night's work assignments. In March of 2006, Vazquez began
working as a permanent part-time employee in the Vandercook
building, where she remained until she was terminated on September
20, 2006. Vazquez grieved her termination and ultimately prevailed
at arbitration, which led to an order that she be reinstated.
Vazquez was scheduled to return to work in November of 2007, but
she ultimately decided not return to RJB.

The EEOC asserts three claims on Vazquez's behalf:
retaliation, harassment, and discriminatory termination. For the
reasons that follow, I conclude that the evidence is insufficient
to enable a reasonable jury to find in the EEOC's favor on the
first these, but that the harassment and termination claims may

proceed to trial.

The theory of the EEOC's retaliation claim is that Jones tried to pressure Vazquez into being his "ally" in a scheme to get rid of the "Mexicans" who would "always give him a hard time." Vazquez Dep., Def.'s L.R. 56.1 Stmt., Exh. 12 at 39:3-4; 40:17-41:2. Vazquez testified that while she was a call-in, Jones would ask her to "go from building to building so that I would be telling on my coworkers whether they were sleeping or what they were doing wrong." *Id*. at 38:13-16. Jones specifically asked her to report on the activities of claimants Venancia Mendoza, Eduardo Chavez, and Sergio Medina, as well as on a janitor named Eduardo Esquivel, who was terminated shortly thereafter. At her deposition, Vazquez was asked, "Did Mr. Jones explain to you why he was, quote, tired of that specific worker?" to which Vazquez responded: "That Mexicans would always give him a hard time," and were "lazy." *Id*. at 39:1-4; 46:7-13. Jones never asked Vazquez for information about African-American workers. *Id*. at 248:18-20.

According to Vazquez, "I would make believe I would hear him, but I was always straightforward in not giving him any kind of information because I had nothing to tell him. And it got to a point where he got tired because he thought that I didn't want to tell him anything. I wasn't playing the game...[a]nd things started to get difficult for me." *Id*. at 40:19-41:5. Vazquez testified that "[a]t first he wouldn't get upset. But as time went

85

by, he pressured me. He would say –– he would ask whether I was concealing things...towards the end when he was tired that I wasn't giving him information." *Id.* at 231:14-232:12.

According to Vazquez, shortly after accusing her of concealing information about her coworkers, Jones pressured Vazquez to accept a permanent, part-time job in the Vandercook building, telling her that if she didn't take the position, he would make sure she would no longer be called in for work as a call-in employee. *Id.* at 86:1-87:3. Vazquez did not want to take the position because it was only part-time, but she felt "worried" because she believed it was "the only way I would be able to keep my job." *Id.* at 234:24-234:2.

Defendants argue that Vazquez's retaliation claim fails as a matter of law because the evidence does not support either: 1) the EEOC's argument that Vazquez engaged in protected activity, or 2) the conclusion that Vazquez suffered any adverse action. While I am inclined to disagree with defendants' first proposition,[28] the

---

[28]The EEOC argues that Vazquez's refusal to report negatively on her Hispanic colleagues without a factual basis falls within the scope of "passive resistance" recognized as protected activity in *McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir. 1996). Defendants respond that because Vazquez admittedly pretended to go along with Jones's discriminatory scheme, there was "nothing to retaliate against." Def.'s Reply at 37. But their argument neglects Vazquez's testimony that although she pretended to cooperate with Jones, Jones nevertheless accused her of "concealing" information from him. In the context of Vazquez's testimony as a whole, a jury could reasonably construe from the statements she attributes to Jones that he believed she was resisting his efforts to discriminate against Mexican workers.

second has merit.

Even assuming that Jones pressured Vazquez to take the Vandercook position, the EEOC cannot plausibly argue that her transfer from a call-in position to a permanent one represented an adverse action, particularly having asserted unequivocally, in conjunction with its failure to promote claims, that "[r]egular positions were more desirable than call-in positions because call-in janitors had no guaranteed work, were not allowed to join the union, and did not get fringe benefits that regular janitors enjoyed."  Pl.'s Amended SJ Memo. at 22 (DN 157).  Even assuming that Vazquez "was taking home far less money" in the permanent position, *id*. at 34 (a statement, incidentally, for which the EEOC provides no record citation), the EEOC cannot reasonably claim, in view of the precariousness of Vazquez's forty-hour call-in schedule and the admittedly (indeed, assertedly) more favorable remaining terms of the permanent position, that Vazquez's transfer itself amounted to a materially adverse action.  *See Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 745 (7th Cir. 2002) (plaintiff's "idiosyncratic" preference for a position that is not "objectively inferior" to another "do[es] not justify trundling out the heavy artillery of federal antidiscrimination law").

The EEOC also argues that Jones subjected Vazquez to retaliatory harassment by making her do more work than the janitors previously assigned to Vandercook.  But although Vazquez testified

that she was responsible for work that had previously been handled by two African-American janitors, there is no evidence that Jones, who was merely a supervisor, had any authority over the number of janitors assigned to Vandercook. Indeed, defendants point to evidence that RJB's contract with IIT specified the number of janitors assigned to the building, and the EEOC itself asserts that it was RJB's project managers who were responsible for posting and filling open janitorial positions. Against these facts, Vazquez's testimony that two janitors were working in the building before she was assigned to it does not, standing alone, reasonably support the inference that Jones decided to assign Vazquez the work of two people in order to retaliate against her. Indeed, as defendants point out, Vazquez does not know, for example, whether the janitors who preceded her were assigned on a temporary basis to deal with transient circumstances, or whether they were also responsible for other buildings during their shift.

As for the EEOC's argument that Jones retaliated against Vazquez by requiring her to polish the lockers every day (rather than merely dust them, as she had previously done), Vazquez initially testified that it was Wesley, not Jones, who imposed this requirement; and although she later attributed the decision to Jones, she said Jones explained that "there was going to be a deep supervision of that building so that they could keep the contract." The statement Vazquez attributes to Jones is not only consistent

with other evidence in the record, it suggests nothing hostile or abusive about Jones's request.  There is simply no basis from which to infer any nexus at all between Vasquez's refusal to provide information about Hispanic employees and the request (whether by Jones or by Wesley) that Vazquez polish the lockers.

In short, even assuming that Vazquez engaged in protected activity, the EEOC's evidence does not support either its retaliation or its retaliatory harassment claims on Vazquez's behalf.

Vazquez's straightforward harassment claim fares better, however.  Vazquez testified that she heard Jones refer to Mexicans as "wetbacks" on one occasion, and that, as noted above, he told her on another occasion that Mexicans were "lazy" and would "always give him a hard time."  In addition to these remarks, Jones allegedly tried to pressure Vazquez, throughout her tenure as a call-in janitor, into helping him "get rid of" Mexican workers he was "tired of."  Regardless of whether Vazquez suffered an adverse action as a result of her refusal to help him, she testified that it was "difficult to be in the middle...[b]etween lying so that Thomas could get rid of people and keep my job,"  Vazquez Dep., Def.'s L.R. 56.1 Stmt., Exh. 12 at 235:4-9, and a reasonable person could indeed find Jones's repeated insistence that Vazquez report on her Mexican coworkers harassing.  In addition, Vazquez also described an incident in which Jones, apparently unprovoked, began

shouting at Vazquez, calling her "stupid" and saying "all Mexicans are like that," and acting in a manner aggressive enough that Vazquez started to cry; an IIT student came over and hugged her; and another RJB supervisor came and physically restrained Jones, who continued to shout "motherfuck you." *Id.* at 52:24-54:13; 219:13-14.

A rational jury could conclude that taken together, Jones's offensive remarks; his conduct in pressuring Vazquez, over the course of several months, to be an "ally" in his effort to "get rid of" other Mexican workers; and his aggressive behavior (coupled with racially-charged insults) on one occasion collectively amounted to subjectively and objectively hostile conduct that was both based on Vazquez's national origin and severe or pervasive enough, over the course of Vazquez's seven month term of employment, to have materially altered the terms or conditions of her employment.

I now turn to Vazquez's termination claim. According to Vazquez's testimony and documents in the record, Vazquez was working at Vandercook one night in September of 2006 when she saw a person she saw every day and recognized as an IIT student trying to get into the building using his key card, which apparently was not working. (Vazquez testified elsewhere that "the cards would sometimes give a lot of problems." *Id.* at 154:7-8) The student knocked on the door and explained that he had left his house key

inside his locker, so Vazquez let him in the building, as she had seen other RJB employees do on multiple occasions. Vazquez heard the student open his locker, after which he returned and asked her if he could use the bathroom. She said yes, directing him to the upstairs bathroom, and continued to clean. When the student returned, he approached her with his pants down and began to masturbate in front of her. Vazquez called campus security, then 911. By the time security arrived, the student had fled. Vazquez reported the incident to either Tony Wesley or Todd Jackson (the evidence on this point is inconsistent), and she also discussed it with Leticia Archibald. Approximately two weeks later, Vazquez received a termination notice, delivered and signed by Tony Wesley, stating that she was terminated effectively immediately for allowing an unauthorized visitor to enter the Vandercook building and failing to follow the RJB handbook rules and guidelines. Def.'s L.R. 56.1 Stmt., Exh. G at 157-162; Exh. 12-F (IIT incident report); Exh. 12-G (termination request) (DN 133-17).

The EEOC argues that Vazquez's termination was discriminatory, and that it can withstand summary using either the direct or the indirect methods of proof. While the issue is close, I conclude that the EEOC's evidence is minimally sufficient to satisfy the elements required under the direct method.

The EEOC's strongest direct evidence that discrimination motivated Vazquez's termination is Wesley's testimony that he told

Shumpert that RJB "would be wrong to terminate her" because she "has no offenses and...it is just not in the guidelines.  I went to the rules, and Angela said, fuck the rules.  It's a stupid ass Puerto Rican fuck."  Wesley Dep., Def.'s L.R. 56.1 Stmt., Exh. 76 at 233:18-22 (DN 137-4).  A jury could reasonably infer from this statement that Shumpert intentionally departed from RJB's termination procedures and meted out excessively harsh discipline based on Vazquez's national origin.

Defendants acknowledge that Shumpert's alleged statement was "crude and insensitive," but argue that it does not "directly point" to a discriminatory reason for Vazquez's termination because: 1) Ron Blackstone, not Angela Shumpert, was the decision-maker; and, 2) in any event, Shumpert made the statement after the decision was already made.  But the record is not as clear as defendants would have it.

Indeed, on the issue of who made the decision to terminate Vazquez, the EEOC also cites evidence of what it characterizes as "a rotating list of decision-makers" as circumstantial evidence that Vazquez's termination was discriminatory.  In its response to Vazquez's discrimination charge before the IDHR, RJB identified only Wesley and Angela Shumpert both as "persons in authority to effect a discharge" and as the final decision makers.  Pl.'s L.R. 56.1 Stmt., Exhs. 107-108 at RJB00001921-22 ¶¶ A6-A7, RJB00001939 ¶¶ A6-A7 (153-11).  In this litigation, however, defendants

initially took the position that Wesley terminated Vazquez "with the authority of Angela Shumpert and Ron Blackstone," and now say it is undisputed that Ron Blackstone alone was responsible for the decision after "discussing it" with Shumpert. Defendants rely on the deposition testimony of Blackstone ("I was told what she did, and I made the final decision that said "Terminate her.") Def.'s L.R. 56.1 Stmt., Exh. 20 at 20:22-23 (DN 133-25), and Shumpert (Blackstone and someone from IIT "made the decision," in which Shumpert was "involved") Def.'s L.R. 56.1 Stmt., Exh. 27 at 241:22-242:3) (DN 133-33), but this testimony is, on its face, inconsistent with evidence of RJB's previous statements regarding who decided to terminate Vazquez.

As for defendants' second argument, defendants do not identify the factual basis for their conclusion that Shumpert's putative statement was made after the decision to fire Vazquez, and the inference that it was made before is at least as plausible based on Wesley's testimony.

A fact finder could conclude from the EEOC's evidence either that Shumpert was the decision maker, or that she influenced Ron Blackstone's decision, and that in either event, Shumpert's anti-Hispanic bias was a factor in the decision. *See Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 528 (7th Cir. 2008) (Where the record suggests that more than one individual was responsible for a particular decision, evidence of discriminatory animus on the part

of "someone who provided input into the adverse employment decision" is relevant). Accordingly, defendants' inconsistent statements about who made the decision to terminate Vazquez may appropriately be considered circumstantial evidence of a discriminatory motive for Vazquez's termination.

The EEOC's argument about "shifting explanations" for Vazquez's termination is somewhat less persuasive, since Vazquez's conduct in granting access to an individual otherwise unable (at least in that moment) to access the building has always been at the heart of RJB's stated basis for termination, regardless of which details of the incident defendants may have focused on at different stages of the proceedings. Nevertheless, the EEOC does identify some evidence from which a jury could infer that defendants attempted to bolster the evidence of their putative rationale for Vazquez's termination after the fact. *See* Pl.'s L.R. 56.1 Stmt., Exh. 109 (DN 153-11) (email from Karen Cash to Angela Shumpert dated May 19, 2007: "see if you can get a letter from IIT customer or security barring JV [Jessica Vazquez] from the site. (Per special request)"). Because a fact finder could infer from this email that defendants' stated reason for the termination was pretextual, it, too, may be considered circumstantial evidence of discrimination under the direct method.

I conclude that taken together, Wesley's testimony that Shumpert statements suggesting that a discriminatory basis for

Vazquez's termination, RJB's inconsistent statements about who made the final decision to terminate, and evidence that the stated reason for her termination was pretextual amount to a sufficiently "convincing mosaic of discrimination" *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994) to withstand summary judgment.

### M. <u>Tony Wesley and Todd Jackson</u>

The EEOC asserts retaliation claims on behalf of Wesley and Jackson (both African-American), arguing that they were terminated (constructively, in Wesley's case) for failing to carry out Angela Shumpert's discriminatory orders to fire certain of the Hispanic claimants whose claims are discussed above. The EEOC proceeds under both the direct and the indirect methods of proof, and much of the evidence on which it relies is discussed elsewhere in this opinion. In short, both Wesley and Jackson testified that Angela Shumpert expressed a bias against Hispanics in general as well as hostility towards specific Hispanic employees in particular (those who were "causing [] troubles" by complaining or going to the union, see, e.g., Wesley Dep., Def.'s L.R. 56.1 Stmt., Exh. 76 at 86:14-19), and each further testified that she threatened to terminate him if he did not terminate those employees. Ella Patterson confirmed that Shumpert wanted to "get rid of" Hispanic employees who caused trouble, and further testified--as did Wesley and Jackson--that Shumpert went so far as to urge supervisory

employees to fabricate reasons to terminate them. Some, though not all, of the targets of Shumpert's alleged national origin-based hostility were, in fact, terminated.

Defendants do not challenge the first two elements the EEOC must establish under the direct method: that Wesley and Jackson engaged in protected activity, and that they suffered adverse employment actions. Defendants are adamant, however, that legitimate, non-discriminatory reasons were the basis both for Wesley's demotion and transfer and for Jackson's termination. With respect to Wesley, defendants argue that undisputed evidence proves that Blackstone, not Shumpert, made the decision to transfer Wesley, and that his decision was based on accounts that IIT was dissatisfied with RJB's performance under Wesley's leadership. But defendants acknowledge that Shumpert was "involved in the decision," so statements attributed to her cannot be ignored. *See Hasan*, 552 F.3d at 528; *Lewis v. City of Chicago*, 496 F.3d 645, 652 (7th Cir. 2007)("a decisionmaker is one who is involved in the process of making the employment decision at issue")(citation omitted). Moreover, if Wesley's version of the facts is credited, Wesley tried to address the problems IIT identified, only to have his efforts undermined by Shumpert.[29] A jury could therefore

---

[29]Wesley acknowledged, for example, that the night supervision at IIT was deficient. According to Wesley, supervisor Santre Holmes was not present at his work site when he should have been, and Wesley recommended terminating him, but Shumpert blocked his efforts to do so. *See* Wesley Dep. Def.'s L.R. 56.1 Stmt., Exh. 76

conclude, even if Blackstone made the ultimate decision to transfer Wesley based on problems he perceived with Wesley's performance, that his perception was influenced by Shumpert's discriminatory and retaliatory motives.

With respect to Jackson, defendants insist that the testimony of numerous witnesses establishes beyond dispute that Jackson was terminated for legitimate reasons including Patterson's discovery, which was reported to Shumpert and ultimately to Blackstone, that Jackson had engaged in a pattern of conduct warranting termination, including leaving the premises during his shift and lying to management about his whereabouts (and coercing the janitors he supervised to do the same). Defendants also raise substantial concerns about the credibility of Jackson's testimony. Indeed, the record as a whole appears to support defendants' suggestion that Jackson was not even present for certain of the events he claims to have witnessed. But the credibility of the EEOC's witnesses is an issue for the fact finder, and the statements Jackson attributes to Shumpert on their face raise an inference that Jackson was terminated for his refusal to discriminate against Hispanics.

In sum, there is no question that the record is rich with evidence to support defendants' account of the non-discriminatory circumstances that culminated in the challenged adverse actions. But because the record also comprises direct evidence that Wesley's

_____

at 53:10-56:22, 59:4-60:4).

97

transfer, and Jackson's termination, were motivated (or, at a minimum, influenced) by Shumpert's discriminatory (i.e., retaliatory) animus, I need not delve into most of the factual disputes surrounding the circumstances leading up to these actions, since they generally relate either to credibility or to whether defendants' asserted, non-discriminatory reasons actually motivated the actions. Neither issue is appropriate for resolution at this stage. *See O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir. 2011) ("It is not for courts at summary judgment to weigh evidence or determine the credibility of [a witness's] testimony; we leave those tasks to factfinders.") (citation omitted) (original alteration); *Diaz v. Kraft Foods Global, Inc.,* 653 F.3d 582, 588 (7th Cir. 2011) (under direct method, plaintiff not required to rebut defendant's non-discriminatory reason at summary judgment).

## V. The Thornwood Claims

Consistently with the EEOC's presentation of its claims on behalf of the Thornwood claimants, I address these claims by claim type, rather than by individual claimant. I remain mindful, however, that to survive summary judgment, the EEOC must establish, as to each claimant, that the evidence supports a prima facie case under the applicable standard.

### A. Overtime Claims

The EEOC's theory of liability as to these claims is somewhat

nebulous.  The claims appear to assert discrimination (as opposed to retaliation or harassment, although the EEOC also relies on the overtime issues as part of its harassment claims), on the stated basis that RJB "limited the amount of information [the claimants] received" about overtime opportunities compared to their African-American coworkers.  The EEOC argues that this violates Title VII's prohibition on "limit[ing]...or classify[ing] employees in any way which would...deprive any individual of...employment opportunities" because of their national origin.  Pl.'s Amended SJ Memo. at 60 (DN 157).  But neither of the authorities the EEOC cites in putative support of its theory, *Williams v. General Foods Corp.*, 492 F.2d 399, 404 (7th Cir. 1974)(express finding that employer undisputedly "distributed overtime opportunities unequally between its male and female employees" entitled plaintiff to summary judgment), and *Lewis v. City of Chicago*, 496 F.3d 645, 654 (7th Cir. 2007) (from which plaintiffs quote: "depending on the type of work, overtime can be a significant and recurring part of an employee's total earnings similar to a recurring raise or it could be insignificant and nonrecurring like a discretionary bonus") offers any foothold for the EEOC's overtime claims on the facts it presents.

To begin with, taking the EEOC's claim on its own terms, the central issue is not whether the claimants were wrongly passed up in favor of their African-American colleagues for any specific overtime shifts they requested, or even how often the claimants

received the overtime shifts they requested as compared with their African-American counterparts. Instead, the EEOC argues that discrimination can be inferred based on the allegedly disparate "amount of information" the claimants received about overtime opportunities. This theory has a similar *gestalt* to the one the I rejected in the context of the EEOC's failure-to-promote claims, in which the EEOC failed to show that any individual claimant was passed up, in favor of an equally or less qualified non-Hispanic employee, for a specific position the claimant was eligible and applied for, but argued that the fact that some African-American janitors were promoted more quickly than the claimants, coupled with RJB's alleged failure to post permanent positions, amounted to evidence of anti-Hispanic discrimination.

Similarly here, the EEOC fails to identify any instance in which an African-American janitor was given an overtime shift the claimants did not know about (and therefore could not request), or any overtime shift that a claimant requested but was wrongly denied in favor of an African-American. Meanwhile, the EEOC sidesteps affirmative evidence that several of the Thornwood claimants were given overtime work at least half of the time they requested it (and that all of the claimants were given at least some of the shifts they requested), and omits the sort of evidence that might allow for a meaningful comparison between how defendants treated claimants versus how they treated African-American janitors with

respect to the distribution of overtime.

For example, claimant Flores testified that she requested weekend overtime between six and ten times and received it "about" four times. Flores Dep., Def.'s Exh. 14 at 52:19-53:11 (DN 133-19). Similarly, claimant Ortega testified that "sometimes when [she] told the supervisor that [she was] interested in working weekends...the supervisor would say that there is overtime available and sometimes he would say there was none available," Ortega Dep., Def.'s Exh. 13 at 181:19-23 (DN 133-18), with the result that Ortega worked roughly half of the "about eight times" she requested overtime. *Id.* at 149:6. Although the EEOC claims (based on these claimants' observations) that African-Americans Kelly and Offett "usually" worked overtime on the occasions Flores and Ortega did not, the EEOC says nothing about how often Kelly or Offett requested overtime; how often their requests were granted; or whether other factors—such as the need to have an English-speaking janitor working that particular the overtime shift--influenced RJB's assignment.[30] Similarly, while the EEOC asserts that claimant Vega received overtime "only after asking Carl

---

[30]Although the parties dispute the extent to which the provision in RJB's contract requiring RJB employees to "demonstrate the ability to communicate with staff and students in verbal and written English sufficient to read and understand equipment and supply instructions, labels and safety requirements," was enforced with respect to weekend overtime shifts, the EEOC acknowledges that non-English speaking janitors could only work Saturday shifts if there was also a bilingual janitor assigned to that shift. *See* Pl.'s L.R. 56.1 Stmt. at ¶ 6.

Rodgers if there was any time available," and that "Rodgers did not approach her first and ask her if she wanted to work overtime," *see* Pl.'s L.R. 56.1 Stmt. ¶ 49, it nowhere claims that, by contrast, Rodgers sought out African-American janitors to ask whether *they* wanted overtime work. Moreover, considering the EEOC's own formulation of its claims as arising out of disparate "access to information," its failure to identify any evidence that African-American janitors at Thornwood received more or better information than claimants did is striking. The only factual statements the EEOC makes in this connection are: 1) that when one night shift janitor was on leave, two African-American janitors on the day shift (Gloria Offett and Rosemary Kelly) were given overtime each weekday to cover the work, and that "Shateau Shorter never advised the night shift employees that they could do the weekday overtime work assigned to Kelly or Offett"; and 2) that prior to November of 2010, RJB did not use a sign up sheet for distributing weekend overtime. These facts simply do not paint a plausible picture of discrimination based on disparate "access to information" about overtime opportunities.

With respect to the weekday overtime opportunities, the EEOC's factual statement itself states that *none* of the night shift janitors, regardless of national origin, was advised about the possibility of earning overtime by covering for their absent colleague. There is simply no basis for concluding that RJB

provided disparate information about overtime to claimants based on their national origin.  As for weekend overtime opportunities, the EEOC does not explain how RJB's failure to post available opportunities before November of 2010 made it more difficult for Hispanic janitors than for African-American janitors to obtain weekend shifts.  Simply put, the EEOC offers neither argument nor evidence from which to infer that RJB discriminated against the Thornwood claimants by providing them with less information about weekend overtime than it provided to African-American janitors.

Other conspicuous omissions from the EEOC's overtime claims are the EEOC's failure to identify the legal standard for analyzing its claims, and its attendant failure to explain how the evidence it asserts meets the requirements of that standard.  The reason is simple: its evidence fails to establish discrimination under any relevant standards.  This case is nothing like *Williams*, in which the employer acknowledged that to comply with state statutory law, it systematically distributed overtime opportunities unequally between its male and female employees.  492 F.2d at 404.  Here, even in the light most favorable to the EEOC, the record reveals nothing more than that the Thornwood claimants sometimes received weekend overtime work and sometimes did not; that sometimes the weekend work the claimants wanted was assigned to African-American janitors instead; and that the claimants believed RJB's decision to have two African-American day shift janitors, rather than any or

all of the Hispanic or African-American night shift janitors, work overtime during the week to cover for an absent colleague was discriminatory. But individually or collectively, these facts are insufficient to give rise to an inference of discrimination.

B. <u>Discriminatory Discharge on Behalf of Minerva Flores</u>

Minerva Flores worked at RJB from January of 2007 until she was terminated in September of 2010. The EEOC claims that her termination was discriminatory, and argues that its evidence is sufficient to substantiate its claim under the indirect method of proof. I disagree.

The parties agree that Flores's termination arose out of an altercation between Flores and Shanteau Shorter, in which Flores objected to Shorter's directive to re-clean the desks and floor of a classroom she had already cleaned. The following is a summary of the events, according to Flores's testimony:

On September 16, 2010, Shorter called Flores back to a classroom Flores had already cleaned and told her to remove graffiti and "black marks" on the floor that remained after Flores's first pass through the room. Flores objected that she couldn't remove the graffiti, complained that she had already cleaned the floors and asked for a different cleaning product to use the second time, then requested to be paid overtime for the work, asking why "Rosemary" got paid overtime and she did not. At that point, Shorter told her, "I've had it up to here with you,"

and "you're always talking about their overtime," then said she was going to "move [Flores] out of this school," and ordered her to hand over her school keys. When Flores did not promptly comply with Shorter's repeated order to give her the keys (saying that she would give her the keys, but that she first wanted to retrieve her belongings), Shorter told Carl Rogers to call security, who arrived shortly thereafter. A security guard asked Flores for the keys, which she gave him, then ordered Flores to leave. One of the security guards asked Shorter whether she wanted him to call the police, whereupon Flores said, "Call them so I can file a report.... If you don't call them, I'll call them," which she then did using her cell phone. The police came and went (after telling Flores that she "could not file a report because it was not a serious thing"), then Flores went to "the district" to ask for a phone number so she could call to complain about her treatment. Flores then walked to her car and left. Flores Dep., Def.'s L.R. 56.1 Stmt., Exh. 14 at 164-170 (DN 133-19).

Flores was terminated on September 22, 2010. The termination request cites "gross insubordination and violation of confidentiality policy" as the bases for dismissal. Def.'s L.R. 56.1 Stmt., Exh. 14-A.

The EEOC does not claim to have direct evidence that Flores was terminated based on her national origin. It argues instead that a prima facie case of discrimination is established by

evidence that: 1) Flores is Hispanic; 2) she was meeting RJB's legitimate expectations; 3) Shorter fired her on September 16, 2010; and 4) Shorter did not fire similarly situated African-American employees. But because neither of the two comparators the EEOC identifies engaged in conduct remotely similar to Flores's, it has not carried its burden as to the fourth element of its prima facie case.

The EEOC identifies Taunda Boykin, an African-American supervisor, and Grace McCoy, an African-American janitor, as putative comparators. According to the EEOC, Boykin called Levetrice Grant a "bitch" in front of Shateau Shorter, for which Shorter gave her a verbal warning. And Carl Rodgers caught Grace McCoy sleeping on the job but did not discipline her. Of the several, immediately apparent distinctions between Flores and the alleged comparators (that Boykin was a supervisor, not a janitor, for one, and that Rodgers, not Shorter, made the relevant decision with respect to McCoy, for another), I need only address the most obvious: the conduct of the respective individuals.

The Seventh Circuit has recently reiterated that "the similarly-situated inquiry is flexible, common-sense, and factual. It asks essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Coleman v. Donahoe*, 667 F.3d 835, 840 (7th Cir. 2012) (internal quotation marks and citation omitted). The *Coleman* court went on to explain that there

106

must be "sufficient commonalities on the key variables between the plaintiff and the would-be comparator" to allow the jury to infer, in the context of the evidence as a whole, that discrimination motivated the adverse action. *Id*. (citation omitted). That clearly is not the case here. Neither Boykin nor McCoy resisted and complained about their supervisor's work orders, much less escalated an ensuing argument to the point of calling the police and complaining to RJB's client. No reasonable fact finder could consider their conduct similar to Flores's, based on Flores's own account of the events.

Because I conclude that the EEOC has not met its prima facie burden with respect to Flores's termination claim, there is no need to proceed to the remaining steps of the analysis. For the sake of completeness, however, I note that the EEOC does not identify any evidence to suggest that RJB's stated basis for terminating Flores was pretextual. This, too, entitles defendants to summary judgment of this claim.

## C. Thornwood Hostile Environment Claims

Although the EEOC's remaining allegations on behalf of the Thornwood claimants generally recount examples of perceived disparate treatment between the claimants and their putative African-American comparators, the EEOC pursues only hostile environment claims based on its evidence in support of these allegations. In this connection, the EEOC points to evidence: 1)

that the claimants were required to do "extra work" compared to African-American janitors; 2) that at two meetings the claimants requested with Shorter and Gant to discuss extra work, Gant screamed "only English, not Spanish"; 3) that the claimants' overtime opportunities were "limited"; 4) that the claimants "regularly" worked through their breaks to complete their work; 5) that one claimant (Ortega) once heard Gant use the word "wetback," and was once "scolded and yelled at" by Gant; 6) that four claimants (Flores, Vega, Maria Villagomez, and Rita Villagomez) were not given supplies "as readily" as African-American janitors were; 7) that three claimants (Vega, Maria Villagomez, and Rita Villagomez) were once disciplined for sitting down before their break, while two African-American janitors were not disciplined for taking a long break; and 8) that one claimant (Maria Villagomez) was once suspended for three days because she did not understand her work assignment and began to work in the wrong area.

At the outset, I agree with defendants that the EEOC improperly lumps the claimants together for the purpose of establishing that any one of them was subjected to a hostile environment. Because my analysis focuses on whether a reasonable jury could conclude, as to each claimant, whether the harassment she alleges was sufficiently severe or pervasive, in the context of her individual working environment as a whole, to cause a reasonable person to believe she was the victim of national origin

based discrimination, it will not do to consider the hypothetical, sum total effect of the alleged incidents, to which no claimant claims she was actually exposed. Nevertheless, I need not linger on this point because even if I were to assume, for the sake of argument, that each of the Thornwood claimants was subjected to each incident of harassment the EEOC identifies, her individual harassment claim would still fail as a matter of law.

Most of the disparate treatment the EEOC alleges on behalf of the Thornwood claimants echos complaints made by the IIT claimants, and the various reasons they generally fail to substantiate a hostile environment claim are spelled out elsewhere in this opinion. The cornerstone of the Thornwood claimants' harassment claims is that they were required to do more work than their African-American colleagues. As it did in conjunction with similar claims on behalf of IIT claimants, the EEOC relies heavily on *Minor v. Centocor, Inc.*, 457 F.3d 632, 643 (7th Cir. 2006), which held that "extra work" was a material difference in the terms and conditions of employment where the increased workload resulted in the functional equivalent of a twenty percent reduction in the plaintiff's hourly pay. But the EEOC does not argue that the "extra work" allegedly required of the Thornwood claimants itself amounted to an actionable adverse employment action, and nothing in *Minor* appears to support the EEOC's theory here.

The Thornwood claimants do not claim to have been required to

perform tasks outside of their ordinary duties or to have worked longer than their designated shifts.[31]  Indeed, the EEOC's evidence that the claimants were required to work harder than their African-American colleagues generally boils down to the subjective perceptions of the claimants, and does not reasonably give rise to the inference that defendants assigned more work to the claimants to harass them based on their national origin.  For example, claimant Flores states in her declaration that when she was assigned the "extra" work of cleaning the cafeteria, the other janitors cleaning the cafeteria with her were "usually" Hispanic, and that African-American janitors only worked with her "about one or two times" of the many times she was assigned the task.  Pl.'s L.R. 56.1 Stmt., Exh. 4 at ¶ 3.  Of course, this testimony says nothing about whether African-American janitors cleaned the cafeteria at times other than those when Flores was also assigned the task, or what other tasks, if any, the African-American janitors may have been doing while Flores cleaned the cafeteria. This type of subjective evidence is insufficient, as a matter of law, to prove disparate treatment, *see Oest v. Illinois Dept. of*

---

[31]Indeed, although all five claimants testified that they worked through their breaks, only one (Ortega) testified that RJB required her to do so, while others (Vega, Rita Villagomez, and Maria Villagomez) specifically testified that no one required them to do so.  In fact, Maria Villagomez testified that after she complained about working through her breaks, Gant told her she had "no reason not to take" her breaks and directed her to take breaks at the designated times, regardless of whether her work was completed.

*Corrections*, 240 F.3d 605, 614 (7th Cir. 2001), and it likewise fails to substantiate the EEOC's claim that any of the Thornwood claimants was targeted for extra work to harass them based on their national origin.

Indeed, affirmative evidence in the record suggests otherwise. When claimant Vega (who similarly testified that she had never seen African-American janitors Arnold Rogers or Debra Mack cleaning the cafeteria after special events, *see* Vega Dep., Def.'s L.R. 56.1 Stmt., Exh. 15 at 56:2-17 (DN 133-20)), asked her supervisor why he did not require Rogers to help clean the cafeteria, he replied, "you know how he works.  He's not going to finish [his regular work] if I send him to the cafeteria."  *Id*. at 60:16-17.  Vega understood her supervisor to mean that Rogers was "very slow," an opinion Vega herself shared.  *Id*. at 61:1, 63:16-20.  Accordingly, Vega herself attributed a non-discriminatory reason to her supervisor's decision not to assign Rogers the same extra work he assigned her.  The EEOC's remaining examples of alleged workload disparities are backed by evidence that is similarly insufficient, in the context of the record as a whole, to raise a reasonable inference discrimination.

Once the "extra work" allegations are removed from the equation, it becomes clear that the remaining episodes of alleged harassment--even assuming they were motivated by the claimants' national origin--fall far short of the kind of severe or pervasive

conduct that can be considered objectively hostile as a matter of law. All of the Thornwood claimants were (or have been) employed by RJB for a minimum of three-and-a-half years. The use on one occasion of an offensive epithet (which may not even have been understood by the claimant who heard it); occasional difficulties obtaining work supplies; one episode of a "scolding" by a supervisor (after the claimant complained about lacking supplies); two episodes of being told by an English-speaking supervisor to speak English during a work meeting; and two instances of allegedly unfair discipline. These events, which generally amount to nothing more than the kind of day-to-day workplace friction that falls outside Title VII's scope, cannot in any event reasonably be said to have "permeated" any individual claimant's work enviroment "with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working situation." *Johnson v. City of Fort Wayne*, 91 F.3d 922, 938 (7th Cir. 1996) (granting summary judgment of harassment claim based on incidents of alleged disparate treatment that did not "ris[e] to the level of a racially hostile working environment"). The EEOC is not entitled to a trial on these claims.

## VI. BCI's Liability as Claimants' Single or Joint Employer

The only remaining issue is whether defendant BCI can be held liable for any of the claims surviving summary judgment under

either the single employer or the joint employer theories of liability. For the following reasons, I conclude that the answer as to both theories is no.

A. <u>Single Employer Liability</u>

The legal framework governing the question of single employer liability in this circuit was established in *Papa v. Katy Industries, Inc.*, 166 F.3d 937 (7th Cir. 1999). The question in *Papa*, in the court's own terms, was "what test to use to determine whether an employer [that is exempt from Title VII liability because it has fewer than 15 employees], should be deemed covered because it is part of an affiliated group of corporations that has in the aggregate the minimum number of employees." *Id*. at 939. The court began by examining the legislative history of Title VII, focusing on the statute's exemption of "tiny employers," and proceeded to identify the "three situations in which the policy behind the exemption of the tiny employer is vitiated by *the presence of an affiliated corporation*." *Id*. at 940. (Emphasis added) These include: 1) when the traditional conditions for "piercing the [corporate] veil" are present; 2) when an enterprise deliberately splits itself into multiple tiny corporations with the purpose of avoiding liability under federal antidiscrimination laws; and 3) when the "parent corporation might have directed the discriminatory act, practice, or policy of which the employee of its subsidiary was complaining." *Id*. at 941.

What is apparent from the *Papa* court's framing of the issue, as well as from its ensuing discussion, is that its analysis was premised on the assumption that some corporate affiliation existed between the plaintiff's nominal employer (i.e., the "tiny" company) and the larger enterprise. Accordingly, the EEOC's assertion that "*Papa*...does not set out a test that applies to affiliates; rather, it sets out a test to determine if multiple entities *are* affiliates for purposes of Title VII liability" is perplexing, and the EEOC's subsequent pronouncement that "[o]ne way in which companies can qualify as affiliates is if one entity directed discrimination against the employees of another" is without support in the law. Indeed, lower courts applying *Papas* look to traditional indicia of corporate affiliation, such as commonality of shareholders, integration of operations, etc. *See, e.g., Birch v. Illinois Bone & Joint Institute, Ltd.*, No. 04 C 7285, 2006 WL 2795040, at *3 n.5 (N.D. Ill. Sept. 28, 2006) (Guzman, J.) ("affiliate" defined as "a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation").[32]

---

[32] Meanwhile, the Seventh Circuit has opined that it is "very doubtful that laws which forbid employers to discriminate create a blanket liability to employees of *other* employers for interference with *their* employment relationships." *EEOC v. State of Illinois*, 69 F.3d 167, 169 (7th Cir. 1995). This further undercuts the EEOC's suggestion that single employer liability exists under Title VII any time an employee of one company directs discrimination against employees of another.

It is undisputed that essentially none of the conventional criteria of affiliation exists here. The EEOC concedes that RJB and BCI maintain separate corporate records, separate bank accounts, file separate tax returns, and are owned and operated by separate individuals. The only operational overlap the EEOC identifies is the participation of Shumpert and, in some cases, Karen Cash (who, it is undisputed, was the head of BCI's human resources department, from which RJB received "human resources consulting services," *see* Def.'s L.R. 56.1 Stmt ¶ 39 (undisputed)) in some RJB employment decisions. But the EEOC offers no authority for its assertion that BCI is somehow "responsible for the alleged discrimination because BCI's and RJB's human resource director, Cash, a BCI employee, was aware of Shumpert's discrimination and bias yet did nothing to stop or prevent it." Pl.'s Resp. at 6 (DN 186). Indeed, the conduct that the EEOC attributes to Cash is even further removed from the discrimination alleged in this case than the hypothetical conduct the Seventh Circuit held would *not* be a basis for single employer liability in *State of Illinois*, 69 F.3d at 169 ("A consultant who advised an employer on how to get rid of its older employees without creating evidence of a violation of the age discrimination law would be an aider and abettor but not an indirect employer.")[33]

---

[33]The EEOC insists that Cash had to "approve" terminations at RJB, as evidenced by the fact that she sometimes signed RJB termination requests next to the word "Approved" or on the line for

Meanwhile, the only case the EEOC cites for its suggestion that corporations not affiliated by conventional criteria may nevertheless be considered single employers liable under Title VII is *Donnelly v. Corvest Prop. Trust*, No. 08-CV-2148, 2010 WL 2265712 (C.D. Ill. June 4, 2010). But the EEOC overlooks that the *Donnelly* court specifically noted evidence in the record that the plaintiff's nominal employer was owned by the putative affiliate, as well as undisputed evidence that the founder and president of the alleged affiliate was also the vice president of the employer. *Id.* at *6. The *Donnelly* court thus identified a genuine factual dispute material to whether the companies could be considered affiliates according to traditional criteria for determining affiliation. It did not suggest jettisoning the requirement that the companies be affiliated, as that term is conventionally understood, for the purpose of applying the single employer theory of liability.

---

"HR Approval." But this evidence does not controvert the testimony of defendants' witnesses, including Cash herself, who testified that Cash had no authority to hire, fire, or discipline RJB employees, and that her "approval" with respect to terminations meant only that she found the requested action to be in accordance with the CBA, the employee handbook, and employment law. *See,* Cash Dep., Def.'s L.R. 56.1 Stmt., Exh. 53 at 27:13-19; see a*lso* Shumpert Dep., Def'.s L.R. 56.1 Stmt., Exh. 27 at 48:11-17, 49:6-50:8. Cash explicitly denied having "authority to terminate employees at RJB," *id.* at 24:14-16, and explained that her role was merely that of a consultant, and that "the decision was theirs, not mine." *Id.* at 27:19. That Ron Blackstone, Angela Shumpert, or others may have introduced or referred to Cash as RJB's human resources director does not change the substantive scope of her authority or otherwise bolster the EEOC's theory.

The EEOC nevertheless tries to shoehorn its case for single employer liability into the third *Papa* scenario on the theory that BCI, through Angela Shumpert, "controlled RJB's operations." I agree with BCI, however, that the EEOC has it backwards: RJB controlled Shumpert, not vice versa. It is undisputed that Ron Blackstone hand-picked Shumpert to act as RJB's general manager; that she reported directly to him on RJB matters; and that although BCI formally paid Shumpert's salary, the cost of her services to RJB were billed back to RJB as part of its consulting arrangement with BCI. Def.'s L.R. 56.1 Stmt., Exh. 51 at ¶¶ 10-11. The EEOC itself emphasizes that RJB held Shumpert out as its general manager; that Ron Blackstone introduced Shumpert to RJB's employees (all of whom applied for jobs with RJB; understood themselves to be employed by RJB; and were subject to RJB's employee handbook), as their "boss"; and that Shumpert had authority to make critical employment decisions on RJB's behalf. These facts support the conclusion that, although nominally employed by BCI, Shumpert acted as an agent of RJB, not of BCI, in her exercise of control over the claimants' employment.[34] None of the authorities cited by the EEOC

---

[34]I further agree with defendants' observation that the EEOC's argument to the contrary stands agency law on its head. The fact that RJB empowered Shumpert to act on its behalf does not mean that Shumpert "controlled" RJB. Were it otherwise, every agent would "control" its principal: lawyers would control their clients, managers would control their employers, etc. This clearly is not the law. *See, e.g., Chemtool, Inc. v. Lubrication Technologies, Inc.*, 148 F.3d 742, 745 (7th Cir. 1998) (test of agency is whether alleged principal controls the alleged agent).

supports the application of single employer liability on the undisputed facts here.

## B. Joint Employer Liability

The EEOC's assertion of the joint employer theory of liability--under which both RJB and BCI would be deemed the claimants' employers--is likewise premised on the assumption that whatever control Shumpert exercised over the claimants' employment was derived from her status as a BCI employee, not as an agent of RJB.[35] As discussed in the previous section, that assumption is not supported by the record. Accordingly, the EEOC gains no traction from authorities discussing the factors that may be relevant to control, such as *E.E.O.C. v. Custom Companies, Inc.*, Nos. 02 C 3768 and 03 C 2293, 2007 WL 734395, 2007 WL 734395 (N.D. Ill. Mar. 8, 2007) (Leinenweber, J.). There is no dispute that Shumpert exercised substantial control over the IIT claimants' employment. She did so, however, not in her capacity as an employee of BCI, but instead as the general manager of RJB.

---

[35]Indeed, although the EEOC states that the five factor "economic realities" test of *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.3d 377 (7th Cir. 1991) governs the applicability of the joint employer theory of liability, it ignores all factors except one: the "degree of control" the putative joint employer exercised over the plaintiff's employment. BCI argues persuasively that the EEOC has presented no evidence to suggest that the remaining factors--"(2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations"--cut in its favor.

Meanwhile, setting aside the role Shumpert allegedly had in the discriminatory conduct at issue, it is undisputed that the claimants' employment was generally governed by the collective bargaining agreement between RJB and the union (to which BCI is not a signatory, and under which it has no rights), and by RJB's employee handbook, which identifies RJB (and not BCI) as the claimants' employer. These documents bolster the conclusion that RJB alone employed the claimants, and undercut any inference that BCI had authority to effectuate, enforce, or implement their terms.

## VII. Conclusion

For the foregoing reasons, defendant BCI's motion for summary judgment is granted. Defendants' motion for summary judgment with respect to the EEOC's IIT claims and the EEOC's Thornwood claims is granted in part. The EEOC may proceed to trial on the following claims only:

1. Discriminatory termination on behalf of Eduardo Chavez, Sergio Medina, Venancia Mendoza, Maria Rosales, Maria Rodriguez, and Jessica Vazquez;

2. National origin based harassment on behalf of Martha Lopez and Jessica Vazquez;

3. Retaliation on behalf of Tony Wesley and Todd Jackson; and

4. Sexual harassment on behalf of Todd Jackson.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated: April 23, 2012